## J. W. WILSON v. E. A. GIRAUD.

### No. 3007.  Decided June 1, 1921.

(231 S. W., 1074.)

**1.—Boundaries—Field Notes—Parol Evidence.**

Once testimony is introduced to establish an inconsistency in field notes, parol evidence which throws light on which call is true and which call is false is admissible, not to override that which is written, but to interpret it. (Pp. 262, 263).

**2.—Same—Calls—Precedence.**

No controlling influence is to be given to a call for a corner of a previous survey over those for bearing trees and marked lines which are found upon the ground to correspond with the calls.  (P. 263).

### 3.—Boundaries—Inconsistent Calls.

In determining boundaries, when all the calls cannot be followed, as few should be disregarded as possible; and in an ambiguous grant such matters of description as clearly appear to have been inserted by mistake should be ignored, and controlling effect given to such as seem certain and most consistent with the intention to be derived from the entire description. (P. 264).

### 4.—Same.

Where a survey called to begin at a point on a bayou designated by bearing trees and a marked line, but also described as on the South line of a league previously surveyed, parol evidence that such bearing trees and marked line were not found on the South line of the league called for, but at a point 702 varas South thereof, and of ancient recognition of this as the true North line of the later survey, was admissible as evidence that the call for the line of the older survey was by mistake and should not prevail over the line designated by the bearing trees and marks and so anciently recognized. (Pp. 259, 260, 262).

### 5.—Boundaries—Controlling Calls.

A grant of land called for boundaries on the South, East and North by three older and connected surveys, the first of which called for the South line of the second as its North boundary, and the third for the West line of the second for its Eastern boundary, and being represented as so connected by the Land Office maps. The calls for these lines of older surveys should prevail over parol evidence that the North boundary of the first, as designated by marked line and bearing trees was not the same as the South line of the second, but was located 702 varas South. To give the call for the North boundary of the first named survey as so established controlling effect would disregard all the other calls of the grant. (Pp. 263, 264).

Question certified from the Court of Civil Appeals for the First District, in an appeal from Harris County.

*E. P.* and *Otis K. Hamblen,* for appellant Wilson.

The land involved in this suit was granted and described in the patents made to Ashbel Smith in 1877 under whom the defendant in this suit claims. This land was titled land at the time the Martha Mings location was made in 1886, evidence of which appropriation was shown in the General Land Office and by the maps of Harris County prior to the Mings location. It was not vacant and unappropriated land, and the Mings location was void. Constitution of 1876, Art. 14, Sec. 2; Winsor v. O'Connor, 69 Texas, 571; Adams v. Railway, 70 Texas, 252; Besson v. Richards, 58 S. W., 613; Knight v. United States Land Ass'n, 142 U. S., 161-216.

If the calls in the field notes or surveys are omitted or ambiguous, the court will sustain said deed or patent by constructing the field notes from those given or that are not ambiguous so as to give effect to the instrument. Mansel v. Castles, 93 Texas, 414; Poitevent v. Scarborough, 103 Texas, 111; Carlisle v. King, 103 Texas, 621.

The field notes of the Smith surveys are unambiguous. They appropriated all of the land lying between the Ellis and the Barrow surveys and west of the Bloodgood running along the Barrow and

Ellis surveys, the distance called for in the patent. If the surveyor was in error as to the distance between the Barrow and the Ellis, nevertheless, the patent would appropriate all of the land and no oral testimony is admissible to contradict the same. Brodbent v. Carper, 100 S. W., 185; Hamilton v. Blackburn, 95 S. W., 1097; Isaacs v. Texas Land & Cattle Co., 99 S. W., 1041; Watts v. Howard, 77 Texas, 72; Railway v. Anderson, 81 S. W., 784; Jamison v. New York & Texas Land Co., 77 S. W., 970; Goldman v. Hadley, 122 S. W., 283.

The testimony was inadmissible and wholly immaterial and irrelevant, because it did not purport to give any of the monuments or descriptions called for in the original survey, but undertook to change the location called for in the field notes by testimony of the description of objects not called for.

*Baker, Botts, Parker & Garwood,* and *C. Z. Carter,* for appellee.

The overwhelming weight of testimony in this case shows that the Benjamin Barrow survey is located at a point approximately 702 varas south of the south line of the Wm. Bloodgood league and that the Smith and Ritchie surveys were constructed upon the Barrow north line, as thus located. Welder v. Hunt, 34 Texas, 44; Smith v. Russell, 37 Texas, 247; Reeves v. Roberts, 62 Texas, 553; Clark v. Hills, 67 Texas, 142; Goodson v. Fitzgerald, 90 S. W., 898.

The acquiescence by the proprietors of adjoining lands (Smith and Ritchie surveys) in a particular line is not unfrequently referred to and received as evidence to determine their boundaries: Bolton v. Lann, 16 Texas, 96; Merriwether v. Asbeck, 25 S. W., 1100; Provident Natl. Bank v. Webb, 95 S. W., 716.

This applies to the acts of the owners of the Barrow. Bohny v. Petty, 81 Texas, 524; Floyd v. Rice, 28 Texas, 341; Lagow v. Glover, 77 Texas, 448; Mullaly v. Noyes, 26 S. W., 145.; Medlin v. Wilkins, 60 Texas, 409; Schunior v. Russell, 83 Texas, 84.

A call for an open, unmarked line in the prairie, such as are the east, south and west lines of the Ellis league, will not control the call for course and distance contained in the field notes of the Smith and Ritchie surveys. Booth v. Strippleman, 26 Texas, 441; Booth v. Upshur, 26 Texas, 69-70; McCown v. Hill, 26 Texas, 361; Gerald v. Freeman, 68 Texas, 201; Johnson v. Archibald, 78 Texas, 96; Baker v. Light, 80 Texas, 633; Gregg v. Hill, 82 Texas, 409; Kuechler v. Wilson, 82 Texas, 645; Oliver v. Mahony, 61 Texas, 612; Fagan v. Stoner, 67 Texas, 287; Aransas Pass Co. v. Flippen, 29 S. W., 813; Morgan v. Mowles, 61 S. W., 155; Layton v. New York & Tex. Land Co., 29 S. W., 1120; Polk County v. Stevens, 143 S. W., 204; Boon v. Hunter, 62 Texas, 582.

The answer to the second question, based upon the finding of the Court of Civil Appeals and the trial court, must be that the Smith and Ritchie surveys tie on to the Barrow north boundary line, and un-

less course and distance are to be controlled by a call for an open prairie line, the field notes of the Smith and Ritchie did not include the land in controversy. The only natural object (Cedar Bayou) and the only artificial object (the north boundary line of the Barrow Survey ) called for in the field notes of the Smith and Ritchie Surveys which are shown to exist today cannot be disregarded in determining the location of these two surveys.

The presumption is, in the absence of any proof to the contrary, that Gillespie in locating the Smith and Ritchie surveys actually went upon the ground with chain and compass and measured and marked out the grant which he was appropriating to their respective claims. This is supported by the following authorities: Kuechler v. Wilson 32 Texas, 644; Gerald v. Freeman, 68 Texas, 204; Boon v. Hunter, 62 Texas, 582; Stafford v. King, 30 Texas, 269.

MR. JUSTICE GREENWOOD delivered the opinion of the court.

The certificate of the Honorable Court of Civil Appeals is as follows:

"To the Honorable Supreme Court:

By an opinion filed by us in this case on the 10th day of November, 1916, a certified copy of which accompanies this certificate, we reversed the judgment of the trial court in favor of appellee Giraud and rendered judgment for appellant Wilson.

On the 25th day of November, 1916, appellee filed his motion for rehearing, which was, by a majority of this court, refused, Mr. Chief Justice Pleasants dissenting.

Entertaining doubts as to the correctness of our opinion since the order refusing the motion for rehearing was entered, we have, on our own motion, set aside the order refusing the motion, and the cause is now pending before this court on motion for rehearing. In as much as we now entertain doubts as to the correctness of our original opinion, we deem it advisable to certify to your Honors, under Art. 1619, Vernon's Sayles' Civil Statutes, the question hereinafter set out, upon the following statement of facts:

On the 10th day of August, 1824, the Wm. Bloodgood league of land in Harris County was surveyed and located. Beginning at its N. E. Corner it runs South 9½ East 5000 varas to a post and mound in the prairie for its S. E. corner; thence South 80½ West at 3000 varas, timber, at 3500 varas Cedar Bayou, at 5000 varas to a post in prairie for its S. W. corner; thence North 9½ West 5000 varas to a post from which an elm marked W. B. bears North 50 West 1 vara, a water oak marked W. B. bears South 25 West 6 varas, for its N. W. corner; thence North 80½ East 5000 varas to place of beginning.

Thereafter a group of surveys were made which call for connection with the lines of the Wm. Bloodgood as follows:

The George Ellis league was surveyed and located by surveyor George M. Patrick on the 17th day of August, 1835. By its locative field notes it begins at a stake and mound on the west bank of Cedar Bayou, on the north line of the Bloodgood league, to run thence with Bloodgood's north line South 80½ West 950 varas to Bloodgood's N. W. corner; thence with Bloodgood's west line South 9½ East 560 varas, prairie, 3400 varas a stake and mound on Bloodgood's west line in prairie for its S. E. corner; thence South 80½ West 4827 varas to a stake and mound in prairie for its S. W. corner; thence North 9½ West 5000 varas to a stake in prairie for its N. W. corner; thence North 80½ East 4777 varas a stake on the west bank of Cedar Bayou for its N. W. corner; thence down said Bayou with its meanders to place of beginning.

The Benjamin Barrow survey was surveved and located by George M. Patrick, the same surveyor who located the George Ellis in 1835, and in the same year. By its location field notes it is described as follows:

'Beginning at a stake on the West bank of Cedar Bayou and on the South line of a league of land granted to William Bloodgood from which a pine 10 inches diameter bears North 70 degrees East distant 8⁵⁄₁₀ varas and an elm 8 inches diameter bears South 60 East distant 4 varas; thence with said Bloodgood's line South 80 degrees 30″ West 4000 varas, stake and mound in prairie for N. W. corner; thence South 9 degrees 30″ West 1490 varas set stake and raised mound in prairie for S. W. corner; thence North 80 degrees East 4230 varas to the bank of said Cedar Bayou, corners on three small pin oaks from which another pin oak 8 inches diameter bears South 35 degrees West distant 5⁵⁄₁₀ varas and a pine 30 inches diameter bears North 11 degrees West distant 10⁴⁄₁₀ varas; thence up said Cedar Bayou with its meanders to the place of beginning.'

On the 23rd day of December, 1874, J. J. Gillespie surveyed and located for Ashbel Smith a tract of land which was thereafter patented to him. By its locative field notes it is described as follows:

'Beginning at a stake on the North line of B. Barrow's ¼ league survey 1500 varas from Cedar Bayou in prairie; thence North 9½ West 1600 varas with the West line of the Wm. Bloodgood league to stake in prairie, the S. E. corner of George Ellis league; thence South 80½ West with the South line of George Ellis 1471 varas to a stake in prairie; thence South 9½ East 1600 varas to a stake in said Barrow's North line; thence North 80½ East 1471 varas with Barrow's line to the beginning.'

On the 23rd day of December, 1874, J. J. Gillespie surveyed and located for Ashbel Smith, assignee of William Ritchie, a tract of land, which was thereafter patented to Ashbel Smith on the 13th

day of December, 1877.  By its locative field notes it is described as follows:

'Beginning at a stake in the North line of Benjamin Barrow's ¼ league survey, being 2971 varas from Cedar Bayou; thence North 9½ West along the western boundary of Ashbel Smith's survey 1600 varas to a stake in prairie in the South line of George Ellis league; thence South 80½ West along said South line of Ellis league 1256 varas to a stake in said line in the prairie; thence South 9½ East 1600 varas to a stake in H. F. Gillett's North line 227 varas from Barrow's N. W. corner and the N. E. corner of said Gillett's survey; thence North 80½ East along said Gillett's and Barrow's North lines to place of beginning, 1256 varas, containing 356 acres.'

On the — day of September, 1886, J. J. Gillespie, who surveyed and located the two Ashbel Smith surveys in 1874, surveyed and located the Martha Mings survey, which is described as follows:

'Beginning at the most southerly S. E. corner of land grant of Geo. Ellis, stake corner in prairie; thence North 9½ West 3400 varas to corner in prairie, in inner South East corner of said Ellis; thence North 80½ East 550 varas to corner in prairie on North West corner of Wm. Bloodgood's league survey; thence South 9½ East 4093 varas, the North East corner of survey in name of A. Smith on Bloodgood's West line; thence South 80½ West 2512 varas to corner in prairie Wm. Ritchie's North line; thence North 9½ West 693 varas to corner in prairie South line of said Geo. Ellis; thence North 80½ East 1963 varas to the beginning.'

For a better understanding of the location of these several surveys and their relation one to the other, Your Honors are referred to Maps A and B in certified copy of our original opinion, which accompanies this certificate.

Appellee made application for the purchase of the Mings survey on November 8, 1907, and on November 21, 1907, the application was approved and the land sold him by the Commissioner of the Land Office in accordance with the statute regulating the sale of public lands.

Appellant has title to 575 acres of land off of the north ends of the Smith and Ritchie surveys.  This 575 acres is described as follows in the deed under which appellant acquired title:

'Beginning 7 varas from the Northeast corner of the Ashbel Smith survey, patent No. 288, Vol. 29, on the West side of the County Road, on the South line of the George Ellis league; thence South 9½ degrees East 1193 varas along the West side of said road to the Northeast corner of 400 acres conveyed by Ruby to Porter; thence South 80½ West 2770 varas to said Porter's Northwest corner on the West line of the said Ritchie survey; thence North 9½ West 1193 varas to the Northwest corner of the said

Ritchie survey on the South line of the George Ellis league; thence North 80½ East 2770 varas to the place of beginning.'

It is apparent from the field notes ·of appellant's land that his boundaries conflict with the Mings survey owned by appellee, if the north lines of the Smith and Ritchie surveys as actually located on the ground are identical with the south line of the George Ellis survey, as the calls in the field notes of the Smith and Ritchie before set out indicate. The true location of the Smith and Ritchie surveys depends upon the true location of the north line of the Benjamin Barrow survey.

S. J. Sjolander, witness for appellee, testified that he moved into the neighborhood where the Benjamin Barrow survey is situated in 1871 (36 years after the Barrow was located); that he had lived there ever since, a period of 41 years; that he is acquainted with the north boundary line of the Barrow survey; that he lived on the Wm. Bloodgood league, perhaps 700, 800 or 1000 yards, something like that, from the Barrow north boundary line; that the north line of the Barrow survey was fenced by Rosamond, Milan & Bro., in about 1878 or 1879, something like that; that before that fence was constructed he had seen and known and was familiar with the north boundary line of the Barrow survey; that he cut wood on both sides of the line and always tried to avoid cutting line trees. He further testified:

'I knew Mr. J. J. Gillespie, a surveyor, many years ago.

The north line of the Benjamin Barrow survey was always considered to start at a little gully down on the bayou, right opposite the Armstrong survey in Chambers County; there is where they always got their line down there, and I remember when Mr. Gillespie was there surveying that he run across certain lines there to get that line, and when he struck this place, always considered that was the line. There were some elm trees, as near as I can remember, on the bank of the gully, right on the bank of the gully almost, that had surveying marks on it, if I remember right, it was cuts and a cross on this little elm, and further out, through the timber, there was small pine trees, some scattering oaks, and you could see the hacks along there, and that is what we were guided by in wood chopping.

I know Mr. P. G. Omohundro. I have seen him in that vicinity, saw him there a couple of months ago, doing some surveying down there. I did not point out to him any marks or lines of any surveys of land; I found him on the line of the Benjamin Barrow tract, lower end of it, on the north line, this line upon which Omohundro was at the time I saw him is the north line of the Benjamin Barrow survey about which I have been testifying. It was the line I spoke of as having been marked through the timber there, and known by reputation in that neighborhood as the north line of the Benjamin Barrow,

where the fence is placed today. I spoke about Mr. J. J. Gillespie being out there doing some surveying, and that I left him on the bayou; Mr. Omohundro was virtually in the same place that Mr. Gillespie was at the time I saw Mr. Gillespie.'

Mr. Omohundro testified:

'I went to that point (the northwest corner of the Armstrong survey, and picked up my work at that point on the bank of Cedar Bayou, on the west side of it on the line which produced west would be a prolongation of the Armstrong, and I measured that distance and ran that line which has the correct bearing as given in the Benjamin Barrow notes, south 80½ west; all these latter surveys ran at that apparently. Mr Sjolander was with me at the time, and I asked him if he recognized that as the Barrow line, and he said he knew it was, and measurements as made from there are as shown on this map here as the north line of the Benjamin Barrow.'

This witness further testified:

'With reference to the northwest corner of the Bloodgood I found the original oak and the original elm called for at that point represented on the map in red; that corner, I would like to get my notes on that so as to be exact, I went to the accepted northwest corner of the Bloodgood league from which an old oak marked X bears south 40½ degrees west 12½ varas and ran north 58¾ west 115½ varas; the reason I ran on a different course, I had already found the corner, and it is indicated here by the red circle; at that point there was an elm 19 inches in diameter with very old marks, bears north 50 west 1 vara, and an old water oak 25 inches in diameter with evidence of W. B. marked on it, bears south 25 degrees west 6 varas, this elm is broken off and a snag stands five feet from the ground, and the oak is also broken off and stands 7½ feet high.'

It was also shown that many years ago the then owner of the Ritchie survey sold a small tract of land out of the southern portion thereof, describing it as beginning on the north line of the Borrow, and that the purchaser, in fencing this tract, recognized the line described by the witnesses Sjolander and Omohundro as the north line of the Barrow.

There is no testimony showing any marked line along the south line or extending west from the S. W. corner of the Bloodgood, and no testimony showing the bearing trees from the beginning corner of the Barrow in the south line of the Bloodgood, as called for in Barrow field notes. The line described by the witnesses Sjolander and Omohundro as the north line of the Barrow is 702 varas south of the south line of the Bloodgood.

Upon these facts we respectfully certify for your determination the following questions:

First: Was the testimony of the witnesses Sjolander and Omohundro tending to show that the true north boundary line of the Barrow

survey was not tied to, and did not run for a distance with, the Blood-good south boundary line, as called for in the field notes by which it was located, but that as a fact it is located 702 varas south of Blood-good's south boundary line, admissible over the objection that it contradicted the written field notes of the survey?

. Second: Was the evidence above set out sufficient to sustain the finding of the jury that the 575 acres of land in controversy was not in conflict with the Smith and Ritchie surveys as those surveys were actually located upon the ground of 1874?''

The following are the maps referred to in the certificate:

We answer that the testimony of the witnesses Sjolander and Omohundro was admissible over the objection that said testimony contradicted the written field notes of the Barrow survey.

The written field notes identified the North boundary line of the Barrow as running South 80 degrees 30 minutes West from a stake for beginning corner, which was described as follows: first, as being at the point of intersection of the West bank of Cedar Bayou with the South line of the league granted to William Bloodgood; and second, as being at a point from which a pine 10 inches in diameter bears North 70 degrees East at a distance of $8\frac{5}{10}$ varas and from which an elm 8 inches in diameter bears South 60 degrees East at a distance of 4 varas.

The testimony of Sjolander and Omohundro tended to show that the elm tree called for in the field notes was not at a distance of 4 varas, on a course South 60 degrees East, from where the

West bank of Cedar Bayou intersected the South line of the William Bloodgood league, but instead that it was at almost the point of intersection of the West bank of Cedar Bayou with the South line of the William Bloodgood 7½ labors.

The points of intersection of the West bank of the Bayou with the South line of the Bloodgood league and with the South line of the Bloodgood 7½ labors were 702 varas apart, and hence the testimony objected to tended to show that the calls in the field notes were inconsistent.

Once testimony is adduced to establish an inconsistency in field notes, parol evidence, which throws light upon which call is true and which call is false, is admissible. The purpose of admitting the parol evidence is not to override that which is written but to properly interpret it. Where it is impossible to give effect to all that is written, effect will be given to that which may be found to be true.

The testimony as to the marked line on a course South 80½ degrees West from the intersection of the Bayou with the South line of the Bloodgood 7½ labors survey, and as to the recognition of that line, and as to the absence of marks along the designated course from the intersection of the Bayou with the South line of the Bloodgood league, was all admissible on the enquiry as to what part of the description in the Barrow field notes was true and what part was false.

In Duren v. Presberry, 25 Texas, 517, a call for bearing trees was held to control as against a call for the corner of an adjacent survey, where no such bearing trees were found at the corner of the adjacent survey and no marked line led therefrom, and where a marked line, running on the specified course, and the bearing trees, which were called for, were found 1000 varas to the North. In delivering the court's opinion, Chief Justice Wheeler said: "We know of no rule for the construction of grants which would give a controlling influence to a call for the corner of a survey over a call for bearing trees and marked lines, which are found upon the ground to correspond with the calls. . . . What distinguishes this case from Anderson v. Stamps, 19 Texas, is that there are calls in the patent which correspond with objects found upon the ground. The correspondence of the bearing trees with the calls in the grant, and the marked line running to the second corner of the survey render it reasonably certain, we think, that the point where these objects are found is the true beginning corner of the survey, and that the call for the Southwest corner of the Brooks Williams league is a mistake."

While the evidence was sufficient to support the finding that the true North line of the Barrow was 702 varas South of the South line of the Bloodgood league; yet, the evidence was conclusive that the

land in controversy was a part of the Smith and Ritchie surveys as located upon the ground in 1874.

Apart from course and distance, the field notes identify the land patented to Smith by reference to the North line of the B. Barrow survey, the West line of the Wm. Bloodgood league, the S. E. corner of the George Ellis league, and the South line of the George Ellis league. To construe the call for the North line of the B. Barrow survey as a call for that line at a distance of 702 varas South of the South line of the William Bloodgood league is to make the call repugnant to every call in the Smith patent, except the calls for course and distance. By construing the call for the North line of the B. Barrow survey as a call for that line as it was at the time designated on the official maps, and as the Barrow field notes pointed to its location by the call to run with the South line of the Bloodgood league, is to prevent any repugnancy between the calls of the Smith patent. The latter construction is reasonable, and since it harmonizes all the terms of the patent it must be adopted under the general rule for the interpretation of written instruments.

If, however, it were impossible to reasonably so interpret the patent as to prevent the disregard of any of the calls, we would still have no hesitancy in rejecting the call for the Barrow North line. In determining boundaries, when all the calls cannot be followed, as few should be disregarded as possible. Hill v. Smith, 6 Texas, Civ. App., 312, 25 S. W., 1083. Therefore, if we had to disregard either the call for the Barrow North line or the calls for the Bloodgood West line, the Ellis Southeast corner, and the Ellis South line, the call for the Barrow North line would be disregarded.

The call for the Barrow North line, if repugnant to the other calls, would be the call to be ignored, under the rule which rejects such matters of description, in an ambiguous grant, as clearly appear to have been inserted by mistake, and which gives controlling effect to such matters as seem certain and "most consistent with the intention to be derived from the entire description." Hubert v. Bartlett, 9 Texas, 104; Finberg v. Gilbert, 104 Texas, 547, 141 S. W., 82; Lilly v. Blum, 70 Texas, 712, 6 S. W., 229; Harrell v. Morris, 5 S. W., 626, 627.

There is no substantial difference in the Ritchie and Smith field notes, in so far as concerns the application of the prinicples we have announced. If the Smith survey extends to the South line of the Ellis league, no one questions that the Ritchie does also.

We answer to the Second Question that the land in controversy was conclusively shown to be a part of the Smith and Ritchie surveys, and included in the patents to Ashbel Smith, and that the testimony of Sjolander and Omohundro did not warrant a contrary finding.

Opinion delivered June 1, 1921.