**WHITTENBURG et al. v. JAMESON et al.**

**No. 4929.**

Court of Civil Appeals of Texas. Amarillo.

Sept. 23, 1940.

Sanders & Scott and Morgan, Culton, Morgan & Britain, all of Amarillo, for appellants.

W. J. Smith and John F. Sturgeon, both of Pampa, for appellees.

STOKES, Justice.

This suit in the nature of trespass to try title was filed by J. A. Whittenburg on February 1, 1936. J. A. Whittenburg afterwards died and the appellants, as substitute plaintiffs and heirs at law of J. A. Whittenburg, on April 10, 1937, filed the second amended original petition upon which the suit was tried. On April 13, 1937, appellees, Amno A. Jameson, a feme sole, on behalf of herself and in her capacity as guardian of Etta Bettie Jameson, a minor, and J. A. Jameson, P. H. Jameson, I. S. Jameson, Bettie Hufstetter and her husband, R. W. Hufstetter, and Nellie D. Eller, a feme sole, filed their original answer and cross-action consisting of a plea of not guilty, general denial, and allegations in the form of trespass to try title against appellants. In their petition appellants sued for the title and possession of a tract consisting of 5.6 acres of land, describing it by metes and bounds, contending that it is a portion of Section 19–V, which lies immediately west of Sections 11 and 12, in Block M–21, of the H. & T. C. R. R. Co. Surveys. In their cross-action, appellees set up title in themselves to all of Section 12, describing it by metes and bounds which extend the west end of the section a sufficient distance to include the 5.6 acres in dispute. Thus it will be seen that the controversy involved in the suit is confined to the 5.6 acre tract, appellants contending it is a portion of Section 19–V, and appellees contending it is included in Section 12.

The record reveals a long history of various surveys that were made in Hutchinson County, beginning in 1874 by a survey of Block 46, H. & T. C. R. R. Co. Surveys, lying south of and adjoining the Canadian River. This survey was made by F. M. Maddox at the same time he surveyed Block 47, H. & T. C. R. R. Co., lying north of and adjoining the river, and probably consisted of an office survey only. At any rate, although there were a large number of sections included in the block, there were no monuments established or marked on the ground locating the corners or lines of any of them. The sections in Block 46 were what is known as River Sections, the north lines meandering with the river, the sections being approximately two miles long and one-half mile wide.

On July 30, 1878, John Summerfield made a survey of several sections of land in the same vicinity known as Block B–4. The location of this survey will be referred to a little later.

In the year 1881 E. C. McLean made the survey which contains Section 12, the title to which is claimed in this suit by appellees, the survey being known as Block M–21, T. C. R. R. Co. The pertinent sections in this survey are Sections 7, 8, 9, 10, 11, 12 and 13. The survey of Block B–4, made in 1878 by John Summerfield above mentioned, lies west of the south portion of

the McLean survey of Block M–21 and south of the Maddox survey of Block 46, H. & T. C. R. R. Co.

In surveying Section 12, Block M–21, McLean began at the northeast corner of Section 11 which adjoins it on the south, and ran thence west 2,850 varas to what he designated as a mound in the east line of Section 57, in Block 46, of the H. & T. C. R. R. Co. Surveys; thence north 200 varas to what he designated as the southwest corner of Section 56, in Block 46; thence east 950 varas to the southeast corner of Section 56; thence north 1,145 varas to the southwest corner of Section 55, Block 46; thence east 950 varas to its southeast corner; thence north 950 varas to the southwest corner of Section 54, Block 46; thence east 950 varas to its southeast corner; thence south 2,255 varas to the place of beginning. In order that these lines, as well as other lines involved, may be traced, we here insert a small plat:

From this plat it will be seen that in running west on the first call in Section 12 from the northeast corner of Section 11, a distance of 2,850 varas, McLean did not encounter the east line of Section 57, in Block 46, as designated by him, but reached a point 141.2 varas west and 278 varas south of the southeast corner of Section 57. This discrepancy arose by virtue of the fact that in 1888, seven years after McLean surveyed Block M–21, George Spiller re-surveyed the River Sections in Block 46, H. & T. C. R. R. Co. and, for the first time, definitely established on the ground the east line and southeast corner of Section 57, as well as the other sections in that block. Spiller's survey located the southeast corner of Section 57 at a point 278 varas north and 141.2 varas east of the point where McLean designated the southwest corner of Section 12. It is evident, therefore, that when McLean ran the south line of Section 12, beginning at the northeast corner of Section 11, and running west 2,850 varas, he thought he had arrived at the east line of Section 57. If the south line of Section 12 terminates 2,850 varas west of the northeast corner of Section 11, regardless of the location of Section 57, Block 46, and McLean's footsteps are traced thence north to the south line of Section 57, the 5.6 acres involved in this case will be excluded and thrown into Section 19–V, which belongs to appellants. If, however, the south line of Section 12 is extended 113.8 varas further west and is 2,963.8 varas in length, as claimed by appellees, and a course run thence north to the south line of Section 57, the 5.6 acre tract is included in Section 12 and belongs to appellees as decreed by the trial court. The vital question in the case is, therefore, whether or not the south line of Section 12, Block M–21, is 2,850 varas in length or 2,963.8 varas in length.

Section 12, consisting of 556.3 acres, was patented January 9, 1935, upon the application of J. W. Hoppes. At that time a new survey was made of the section by A. H. Doucette. In making this survey Doucette began at the northeast corner of Section 11, the same point at which McLean began the original survey of the section. Instead of running thence west on the north line of Section 11, however, as McLean had done when the original survey was made in 1881, Doucette ran north with the west line of Section 74,

Block Z, which is the east line of Section 12. He thus arrived at the northeast corner and then followed the south lines of the adjoining river sections in Block 46 until he arrived at the southeast corner of Section 57, as established by Spiller in 1888. Thence he ran west (N. 89° 43' 40" west, to be exact) 242.5 varas; thence south 276.6 varas to the northern northwest corner of Section 11 as he had located it; thence east with the north line of Section 11, as he had located it, 2,963.8 varas to the place of beginning. Thus it will be seen that the patent issued by the State in 1935 includes the 5.6 acres here involved by virtue of the fact that the south line of Section 12, which is also the north line of Section 11, is extended 2,963.8 varas instead of 2,850 varas as designated by McLean when the section was originally surveyed by him.

The general rule of law is well established in this State that a grant of land should be established by the calls of its own field notes. Inconsistencies frequently develop in following the footsteps of early surveyors who established lines and corners of surveys, and when this happens we are supplied by the decisions with rules to which resort may be had and parol evidence may be entertained, if necessary, to relieve doubt and locate the lines which were actually run by the surveyor. Thompson v. Langdon, 87 Tex. 254, 28 S.W. 931, 935. Judge Gaines, speaking for the Supreme Court in the cited case, and referring to this rule, said: "It is but a case of a latent ambiguity in a written instrument. A writing unambiguous upon its face may become doubtful when applied to the subject-matter of the description. On the other hand, if there be no conflict in the calls found in the field notes of a survey, there is no room for construction, and the calls must speak for themselves. To permit the introduction of parol evidence to vary the calls would be to violate the familiar rule that extraneous evidence is not permissible to vary a written instrument. Such is the case before us. None of the objects called for in the field notes of survey No. 104 for the purpose of identifying its corners were found upon the ground, except those used to designate the place of beginning. If the north boundary line or the northwest corner of No. 105 had been called for, then parol evidence would have been admissible in order to show where that

line was actually run, and in case of a conflict the call for distance would have been controlled by the establishment of such line."

■ Furthermore, as held by the Supreme Court in the above case, it is not proper to resort to the calls in the field notes of other surveys even though they may have been made at the same time and by the same surveyor in order to create a conflict when none will arise from the calls of the survey involved under application to the objects called for as actually found on the ground. This is pertinent for the reason that in adding the 113.8 varas to the west end of Section 12, Doucette resorted to the corners established by John Summerfield when he surveyed Block B–4 on July 30, 1878. Doucette justified his act in resorting to that survey by two incidents shown by the record: First, that in surveying Block M–21 in 1881 McLean tied the west line of Section 7 in that block to the east line of Section 1 in Block B–4 surveyed by Summerfield, and, secondly, that the southwest corner of Section 6 in the latter block is a well established and marked corner. The record shows that McLean did tie the west line of his Section 7 to the east line of Section 1, Block B–4, entering the distance as 941 varas. Doucette, in running the lines of the sections in Block B–4, found that the distance actually existing upon the ground between Section 1 of his Block B–4 and Section 7 of McLean's Block M–21 was 1,026.2 varas, instead of 941 varas, as called for by McLean. This had the effect, if Doucette's survey takes precedence, of establishing the east line of Section 1, Block B–4, at least 75.2 varas west of where it would be if located 941 varas west of the west line of Section 7, in Block M–21, and adding the excess in distance to the south line of Section 9, Block M–21.

In surveying Sections 9, 10, 11 and 12, Block M–21, Doucette carried this excessive distance through the west lines of all of them, picking up, perhaps, additional excessive distances, to the west end of Section 12 so that, by the time he reached that point, the excess amounted to 113.8 varas. The record is voluminous and the testimony concerning these excesses and the surveys made by Doucette is of a technical nature and, since, in our view of the case, the manner in which Doucette thus established the southwest corner of

Section 12 is immaterial, we do not deem it necessary to enter into an extended explanation or discussion of it.

We do not think it is proper under the record in this case to establish the southwest corner of Section 12, Block M–21, from the southwest corner of Section 6 in Block B–4, because, in order to do so, the northeast corner of Section 1 in Block B–4 must first be definitely established and the testimony reveals a natural monument consisting of a large cottonwood tree marked "X" near the south line of Section 2 in that block from which the northeast corner of Section 1 would be located at an entirely different place from where it would be if located from the southwest corner of Section 6. It is true there is some doubt as to whether the cottonwood tree was an east bearing or a west bearing tree from the point on the south line of Section 2 designated by John Summerfield in the original survey, but taken in connection with the location of the east line of Section 1, Block B–4, as indicated by McLean, it is of sufficient significance to cast doubt upon the accuracy of the location of the northeast corner of Section 1 made by Doucette according to his testimony. Furthermore, there is shown in the record and on the plats accompanying it a definite recognized monument much nearer the northeast corner of Section 11 (which was McLean's beginning point in his survey of Section 12) than the southwest corner of Section 6 in Block B–4 or the northeast corner of Section 1 in that block. The monument referred to is located at the northwest corner of Section 13 in Block M–21. It is called for by McLean in his original field notes of that section which is a portion of Block M–21, and is part of the same general survey as Section 12. The monument is designated as an "old pile of rocks." It is located at the southwest corner of Section 72, Block Z, which, as we have stated, is also the northwest corner of Section 13. The authenticity of this monument is not questioned by any of the witnesses or surveyors but is recognized as an established corner by all of them. By running from this corner north to the northwest corner of Section 72, which is 120 varas south of the northeast corner of Section 10, Block M–21, thence east 1,900 varas, the southeast corner of Section 11 is reached. From this point north 1,089 varas with its east line, the northeast corner of Section 11 is reached, and that was the beginning point of McLean's original survey of Section 12. These courses and distances are not disputed

by any party to this suit. No surveyor has brought them into question by his testimony and we conclude that this is the only accurate process by which the northeast corner of Section 11 can be located. Moreover, it is attained according to the field notes of the same survey of which both Section 11 and Section 12 are a part, viz., Block M¹-21.

It is quite correctly held by our courts that it is not proper to resort to field notes of another survey in order to create conflicts where no such conflicts appear from the calls of the survey in question and applied to the objects or monuments designated as actually found on the ground. Thompson v. Langdon, supra; State v. Sun Oil Co., Tex. Civ.App., 114 S.W.2d 936; Petty v. Paggi Bros. Oil Co., Tex.Com.App., 254 S.W. 565; Upshur County v. Lewright, Tex.Civ.App., 101 S.W. 1013.

It was said by the court in the Sun Oil Company case [114 S.W.2d 946] that "Where a survey can be located according to its own field notes from established corners called for therein, this is the proper method of location, rather than to look to the field notes of other surveys, especially when, by relying on field notes of other surveys, inconsistencies will occur and conflicts with other surveys result."

■■■ The boundaries of Section 12 can be accurately determined from the calls of McLean's survey of Block M–21. The sections in that survey were constructed one above the other and the entire block constituted one piece of work. McLean, no doubt, had surveyed Section 11 immediately prior to his construction of Section 12 and knew the exact spot where the northeast corner of Section 11 was located. Having called for the pile of rocks at the southwest corner of Section 72 when he surveyed Section 13, he undoubtedly knew where that monument was located and constructed the entire block of sections from that monument. We think it clear, therefore, that McLean knew the location of the northeast corner of Section 11 which constituted his beginning point in surveying Section 12. The object which the courts have in view in ascertaining boundaries of surveys is the intention of the surveyor and it is universally held by the courts that such intention must be ascertained from his report of his work where that is possible. We are, therefore, concerned here only with the original intention of McLean when he made his survey of Section 12 in 1881, as reflected by his field notes, and if his footsteps can be traced from the report which he made of his work, it is our duty to follow them. The field notes made by him at that time reveal that, from the northeast corner of Section 11 he ran west a distance of 2,850 varas. At this point he says in his field notes that he encountered the east line of Section 57, Block 46, and established at that point the corners of both Sections 11 and 12. When George Spiller made a re-survey of Section 57, in Block 46, seven years later, it was found that that section was some distance north of the point where McLean stopped. He was mistaken, therefore, when he said in his field notes that he arrived at the east line of Section 57. If the east line of Section 57 had been in the neighborhood of where McLean thought it was, it, being an artificial object, would have controlled over the course and distance which he said he followed in running the south line of Section 12, in event of a conflict, but by Spiller's later survey it was revealed that McLean was mistaken as to the location of Section 57, and in that event the course and distance traveled by him will control. The rule controlling a situation such as this is well established by many authorities. A call for adjoinder, such as McLean made for the east line of Section 57, ordinarily controls over a call for course and distance, but when it is shown that the adjoinder call was the result of a mistaken belief as to the existence of the adjoinder, the call for course and distance then takes precedence and is controlling. It was said by Judge Smedley, speaking for Section B of the Supreme Court Commission, in Blake et al. v. Pure Oil Co. et al., 128 Tex. 536, 100 S.W.2d 1009, 1012, that:

"In such situation the call for adjoinder will be rejected as inserted by mistake and controlling effect given to course and distance from known or undisputed corners, when under the facts of the particular case such construction of the survey is 'most consistent with the intention to be derived from the entire description.' Wilson v. Giraud, 111 Tex. 253, 264, 231 S.W. 1074, 1078; Porter v. State (Tex.Civ.App.) 15 S.W.2d 191, 193; Finberg v. Gilbert, 104 Tex. 539, 547, 141 S.W. 82; Gerald v. Freeman, 68 Tex. 201, 204, 4 S.W. 256; State v. Sullivan [127 Tex. 525], 92 S. W.2d 228; State v. Talkington (Tex.Civ. App.) 274 S.W. 314; Cox v. Finks (Tex. Civ.App.) 41 S.W. 95, 99; Gilbert v. Finberg (Tex.Civ.App.) 156 S.W. 507; Lafferty v. Stevenson (Tex.Civ.App.) 135 S.W.

216, 220; Lomax v. Rowe (Tex.Civ.App.) 3 S.W.2d 498; Burton v. McGuire (Tex. Com.App.) 41 S.W.2d 238."

Following the rule thus announced and well established by the many cases cited by Judge Smedley, we must conclude that the length of the south line of Section 12 is 2,850 varas, and no more. In running from the west end of that line north, McLean's field notes say that he encountered the southwest corner of Section 56 at 200 varas. As Section 56 was subsequently located by Spiller, however, its southwest corner is some distance north and east of that point, hence the only rational course that can be followed to attain the result which McLean unquestionably sought to attain, and thought he had attained, would be to extend the 200 vara call to the south line of Section 57 as subsequently located. Since the south line of Section 57 is encountered at this point, in order to reach the southwest corner of Section 56, it is necessary to run east 141.2 varas; thence north with the east line of Section 57 to the southwest corner of Section 56. If the lines of Section 12 are thus established, they exclude the 5.6 acres in controversy and this impels the conclusion that the tract in dispute is not a part of Section 12, Block M–21, but is a portion of Section 19–V and belongs to the appellants.

■ Appellees contend that, since the case was tried by the court without the intervention of a jury and the evidence was conflicting as to the distance or length of the south line of Section 12 and, therefore, as to the location and ownership of the 5.6 acres in controversy, the finding by the trial court establishing the length of that line as 2,963.8 varas and thus including the tract in controversy, instead of 2,850 varas as shown by McLean's original field notes, and thus excluding it, is conclusive upon this court. If appellees were correct in their premise, their conclusion of law in this respect would undoubtedly be correct, but we do not agree with appellees that the testimony is conflicting. The trial court, in our opinion, adopted an erroneous basis upon which to arrive at the correct length of the south line of Section 12. The record does not reveal findings of fact, but it is obvious that the trial court located the southwest corner of Section 12 from the southwest corner of Section 6 in Block B–4. The cardinal element of interpretation to be followed in locating lines, corners and areas in situations such as this is the intention of the parties, and that intention must, when possible, be ascertained from the reports which contain the details of the work done by them. Where it is possible to ascertain from his report the intention of the surveyor in locating the original lines of a survey of the work performed by him, it is not proper to consider other reports or surveys even though they may have been made by the same surveyor. We think this can easily be done from the report made by McLean when he made his original survey of Section 12. He began the survey of this section at the northeast corner of Section 11 and from what we have said in reference to the recognized monument in the northwest corner of Section 13 of the same survey, this beginning point can easily and accurately be located. As we have indicated, it is quite probable that McLean terminated the west end of the north line of Section 11, which is also the south line of Section 12, at 2,850 varas because he was laboring under the belief that the east line of Section 57, Block 46, was located there, yet, in surveying Section 12, he did not call for the northwest corner of Section 11 and we find nothing in his field notes nor in any of the work done by him in surveying Block M–21 which indicates or even suggests that he would have extended the south line of Section 12 a greater distance than 2,850 varas even if he had known that the east line of Section 57 in Block 46 was not actually located upon the ground at that point as he undoubtedly believed it was. The south line of Section 12 is the same as the north line of Section 11 of the same block and it was located by McLean at the same time and as a part of the same piece of work. In running the north line of Section 11 when that survey was constructed, he found it to be 2,850 varas and, in our opinion, there can be no doubt that it was his purpose and intention to establish the south line of Section 12 upon the same line as he had established the north line of Section 11. Controlling effect is always given to calls which will effectuate the intention of the surveyor and the course of his footsteps, as reflected by his report in running his lines, and any call which is inconsistent with that intention as reflected by the report of his work and results in its defeat must be rejected. As we have said, the record establishes beyond doubt that McLean's intention was to establish the south line of Section 12 upon

a course west from the northeast corner of Section 11 and terminate it at a distance of 2,850 varas. His intention to do so being obvious from the work performed by him on the ground in making the original survey, and his field notes showing plainly that he did so, it is not proper, and the trial court, in our opinion, erred in adopting the corners and lines established by Summerfield when he constructed Block B–4. There is no conflict in the evidence when applied to the lines run in Block M–21 by McLean. The conflict arises only when the lines run by Summerfield in Block B–4 are considered, and regardless of whether conflicts arose between the two surveys by virtue of corners established by Summerfield, or whether Summerfield's surveys were properly located on the ground, the fact remains that when McLean's work is considered and his footsteps followed, the testimony is barren of any conflict whatever. The trial court having adopted an erroneous basis for establishing the southwest corner of Section 12, his conclusion and judgment is likewise erroneous and must, therefore, be revised. Miller v. Southland Life Ins. Co., Tex.Civ.App., 68 S.W.2d 558.

From what we have said it is obvious that, in our opinion, the court below committed reversible error in rendering judgment for the appellees. The case was fully developed and no purpose could be served by another trial. The judgment should have been in favor of appellants and it will, therefore, be reversed and judgment here rendered that appellants recover of appellees the title and possession of the 5.6 acre tract described in their petition.