THE STATE OF TEXAS V. E. B. SULLIVAN ET AL.

No. 7028. Decided March 25, 1936.
Rehearing overruled June 24, 1936.
(92 S. W., 2d Series, 228.)

*William McCraw,* Attorney General, *Ralph W. Yarborough,* Former Assistant Attorney General, *H. Grady Chandler,* Assistant Attorney General, *Ireland Graves, Ike D. White, Homer C. DeWolfe* and *E. Cartledge,* all of Austin, for plaintiffs in error.

A call in the field notes of a survey for a prior survey made upon an erroneous belief as to the location of same will not control a call for course and distance, as such a call would

be based upon mistake and conjecture. New York & Texas Land Co. v. Thomson, 83 Texas, 169, 17 S. W., 920; Sanborn v. Gunter, 84 Texas, 273; Findlay v. State, 113 Texas, 30, 250 S. W., 651; Huff v. Crawford, 89 Texas, 214, 34 S. W., 606.

*R. O. Kenley, Vinson, Elkins, Sweeton & Weems* and *David T. Searls,* all of Houston, *Williams, Neethe & Williams,* and *F. A. Williams,* all of Galveston, for defendants in error.

The calls in the south line of Harper's field notes of the Slade Survey for the adjoinder with the northwest corner and north line of the Ransom House one-third league, which had been surveyed and marked on the ground, control over the calls for course and distance in such field notes. McCarty v. Pugh, (Com. App.), 265 S. W., 126; Keller v. Hollingsworth, 78 Texas, 653, 15 S. W., 110; Davis v. George, 104 Texas, 106, 134 S. W., 326.

*Maco Stewart* and *Samuel Peterson,* both of Galveston, filed brief as amicus curiae.

MR. JUDGE SMEDLEY delivered the opinion of the Commission of Appeals, Section B.

This is a boundary case and the particular question for determination is whether a tract of 15.77 acres of land lies within the bounds of, or outside of, the Theodore Slade survey in Montgomery County.

On November 10, 1932, the Commissioner of the General Land Office, under the authority given him by Chapter 271, Acts Regular Session of the Forty-second Legislature, leased the tract of land in controversy herein to J. E. Franks as unsold public school land for the purpose of prospecting for and producing oil, gas and other minerals. Franks had theretofore filed application and caused a survey to be made by a licensed land surveyor and the field notes had been approved by the Commissioner of the General Land Office. The lease was assigned by Franks to Humble Oil & Refining Company. That company a short time thereafter procured also an oil and gas lease covering the same tract from defendants in error E. B. Sullivan and W. W. Hawkins, who asserted some sort of claim to the land, the nature or source of which is not disclosed by the record, as a part of the Theodore Slade survey. The Humble Company drilled a producing oil well near the center of the tract.

Sullivan and Hawkins obtained permission from the Legislature to sue the State to try the title to the tract of land in controversy, and this case originated in their suit against the

State, in which the Humble Oil & Refining Company was also made defendant. Sullivan and Hawkins took a nonsuit and the case was tried on the State's cross action seeking recovery of the title and possession of the land, subject to the mineral lease which it had issued, in which cross action Sullivan and Hawkins, Franks and Humble Oil & Refining Company were named defendants. Upon trial before the court without a jury judgment was rendered that the State take nothing by its suit for the title and possession of the land, and further that the mineral lease executed by the State to Franks be cancelled. This judgment was affirmed by the Court of Civil Appeals. 87 S. W. (2d) 867. No findings of fact were filed by the trial judge and the Court of Civil Appeals in its opinion made no findings of fact. The two surveyors who testified are practically in agreement as to all the physical facts, and the problem presented is to determine from the undisputed facts the true location of the boundary lines of the Theodore Slade survey, particularly of the eastern portion of its south boundary line.

The tract of land in controversy is the shaded area on the accompanying sketch, with its corners designated by the letters

C, D, R and S. The Ransom House survey of two-thirds of a league, the Joseph House survey, the C. B. Stewart survey, the S. H. Bryan survey, and the W. C. C. Lynch survey were surveyed by W. M. Rankin during the months of May and June, 1838. These several surveys are bounded on their west by the San Jacinto River. Evidently they were surveyed on the ground. Their field notes describe marked bearing trees at each of their corners and further fix the location of many of their lines by calls for creek crossings, giving the distance to the crossings and often the widths and courses of the creeks. The Lang league, an abandoned survey, was surveyed by John Carson after August 1, and prior to December 4, 1838. Its west line, which runs north and south, is indicated by a line in part broken in the northeast part of the area covered by the sketch.

The Ransom House survey of one-third of a league and a labor, sometimes referred to as the Ransom House Remainder survey, was surveyed by John M. Wade January 19, 1839. Its field notes describe it as beginning at the southeast corner of the W. C. C. Lynch survey, and call for the bearing tree there which is described in the field notes of the Lynch survey. They call for its southeast corner to be at a corner of the Lemuel Smith survey, describing two bearing trees at that point. At the northeast corner of the Ransom House Remainder survey two marked bearing trees are called for in the field notes, and the north line of the survey is described in considerable detail as marked by three crossings of Crystal Creek, the width and course of the stream being given at each point of crossing. Two marked bearing trees are described as evidencing its northwest corner. The field notes do not at this point or along its west line call for any corner or line of the Stewart survey. Along other lines of the survey and at other corners creek crossings and bearing trees are described.

The Theodore Slade survey was surveyed by Andrew Harper on November 19 and 20, 1846, nearly eight years after Wade surveyed the Ransom House Remainder survey. The field notes recite that the survey is situated east of the San Jacinto River and that it adjoins the surveys of C. B. Stewart, Joseph House and Ransom House, evidently referring to the larger or more western of the two Ransom House surveys, as it rather than the Ransom House Remainder survey is shown on the sketch accompanying the field notes. The metes and bounds of the Slade survey in its field notes are as follows:

"Beginning at the Southeast corner of Joseph House's Sr.

Survey of his Head Right on the North boundary line of C. B. Stewart's headright survey, a post from which a magnolia 16″ in diameter marked C bears south 29 W. 4 varas and a white oak 36″ in diameter marked H bears S. 67 E. 11 varas;

"Thence North 75 East with said Stewart's Survey 3000 varas to the West boundary line of Ransom House's Remainder Survey. Set a post from which a red oak 20″ in diameter marked X bears S. 60 E. 9.7 varas;

"Thence N. 15 W. with said House's Survey 75 varas to the NW corner of same, a post from which a pine 8″ in diameter marked H bears N. 27 W. 2 varas distant;

"Thence N. 75 E. with said Survey 1100 varas to West prong of Crystal Creek course South 1275 varas to the point where the West boundary line of Edward Lang's League (R. A. Chinn, Assignee) crosses the North Boundary of said House's Survey;

"Thence North with said line 1885 varas. Set a post for the Northeast corner of this survey in a dense thicket of undergrowth. No bearing trees;

"Thence South 75 W. at 4153 varas intersected the East boundary line of Ransom House's Survey. Set a post from which a pine 22″ in diameter marked S bears South 46 W. 2.6 varas and white oak 12″ in diameter marked S bears North 15 E. 11.5 varas;

"Thence S. 15 E. with said survey 102 varas to the Southeast corner of the same, a post from which a white oak 14″ in diameter marked W. S. bears South 6 E. 10 varas and a red oak 12″ in diameter marked X bears North 87 W. 10 varas distant;

"Thence South 75 W. with said survey at 280 varas Caney Creek 3 varas wide course South 595 varas to the Northeast corner of Joseph House's Sr. said survey, a post from which a white oak 24″ in diameter marked H bears North 28 W. 5 varas and a white oak 36″ in diameter marked C bears south 50 W. 10 varas;

"Thence S. 15 E. with said Joseph House's Survey at 650 varas Caney Creek 3 varas wide course South 1790 varas to the beginning corner."

The area covered by the surveys shown on the accompanying sketch was heavily timbered, but has been cut over three times, and none of the bearing trees described in the field notes of the several surveys can be found. The solid lines on the sketch represent the lines as to the location of which there is no controversy. The broken lines (except the partly broken

line for the west line of the Lang league, as to the location of which there is no controversy) represent lines, the location of which is disputed or uncertain. The two expert witnesses who testified for the opposing parties agree that the northwest corner of the Ransom House Remainder survey is at the point indicated on the sketch by the letter C, and there is no controversy between them as to the location of the corners of the Slade survey indicated by the letters A, H, G, F and E. The trial court's judgment, in accordance with the position taken by the defendants in error, had the effect of fixing the position of the south line of the Slade survey along the lines marked by the letters A, B, C and D, while plaintiff in error contends that such south line is correctly located as marked by the letters A, P, Q and S.

The south line of the Slade survey is described in the field notes as beginning at the southeast corner of the Joseph House survey (point A on the sketch) and running thence north 75 east with the north line of the Stewart survey 3000 varas to the west boundary line of the Ransom House Remainder survey. When this line is run on the ground from the undisputed beginning point, it does not reach the west line of the Ransom House Remainder survey at 3000 varas. It must be extended to a total distance of 3550 varas to reach a point (B on the sketch) as far east as the west line of the said House survey. When the line is thus extended its eastern terminus falls, not on the west line of the said House survey, but 75 varas north of its northwest corner. The second line of the Slade survey is described in the field notes as running north 15 west with the House Remainder survey 75 varas to the northwest corner of the same. Even if the first line is extended 550 varas it is necessary to reverse the call and run the second line south 15 east in order to reach the northwest corner of the said House survey, point C on the sketch). Further difficulty is encountered in applying to the ground the description of the third line of the survey, "thence N. 75 E. with said survey 1100 varas to west prong of Crystal Creek course south 1275 varas to the point where the west boundary line of Edward Lang's league crosses the north boundary line of said House survey," for the distance between the northwest corner of the House survey and the west line of the Lang league (points C and D on the sketch) is but 700 varas instead of 1275 varas, and Crystal Creek crosses the north line of the Ransom House Remainder survey some distance east rather

than west of the point where the Lang league line intersects the line of the said House survey.

The foregoing discrepancies between the field note calls and the facts on the ground account for the presence in this case of the often recurring problem in boundary suits, whether controlling effect is to be given to courses and distances set out in the field notes or to calls for adjoiners. If courses and distances are disregarded and the lines of the survey run so as to satisfy the call for the northwest corner of the Ransom House Remainder survey and thence with its north line to its intersection with the west line of the Lang league, then the land sued for is within the bounds of the Slade survey, while if the south line of the Slade survey is constructed in accordance with the courses and distances contained in the field notes and the call for the northwest corner and the north line of the House survey disregarded as made by mistake, the tract in controversy lies outside and south of the Slade survey.

Defendants in error present two propositions as supporting the trial court's judgment. The first of these is in substance that from the judgment it is to be presumed that the trial court found that Harper, in making the Slade survey, in fact went to the northwest corner and along the north line of the Ransom House Remainder survey, and that there is evidence supporting such finding.

■ We have carefully read the statement of facts and find no evidence whatever tending to prove that Harper actually went to the northwest corner of the House Remainder survey or along its north line, except the call for such corner and line in his field notes. No bearing trees marked or called for by him can now be found, nor are there any marked lines sufficiently old to have been marked by him. It is true that a surveyor is presumed to have gone to the corners and lines that his field notes call for, but it is also true that he is presumed to have run the lines of his survey on the courses and for the distances described in his field notes. The presumption arising from a call for adjoinder may, on account of the rule as to relative dignity of calls, be sufficient to overcome the presumption arising from a call for course or distance, when the variation in the course or the excess in the distance is not unreasonable and there is no other evidence than such not unreasonable variation or excessive distance tending to prove that the surveyor did not go to the adjoinder. But the presumption that the surveyor went to the corner or line called for may be, and

we think is here, entirely overcome by facts in evidence proving that he did not go there.

Tracing the surveyor over the lines, we find that according to the undisputed evidence he would not have reached the west line of the House Remainder survey, or a point as far east as that line, when he ran north 75 east from his beginning corner a distance of 3000 varas, but he would have been obliged to run an additional distance of 550 varas. It is not reasonably to be assumed that he made a mistake of that magnitude in running his first line. But if it be assumed that he made that mistake and actually went to a point 3550 varas north 75 east of his beginning point, he then could not have reached the northwest corner of the House Remainder survey by running north 15 west as his field notes call, but would have been obliged to run in exactly the opposite direction. There is no basis for an assumption that he ran the line south 15 east and erroneously entered the reversed call in his field book and field notes. The sketch which he made on his field notes shows the northeast corner of the survey made by him to be north 15 west of what he believed to be the position of the northwest corner of the House Remainder survey. To indulge such assumption would be to enter the realm of speculation and to make charges of errors on the part of the surveyor which are refuted both by his field notes and by his sketch. But assuming that Harper in fact was at the northwest corner of the House Remainder survey, and giving to the next call the benefit of the same presumption, that he did what he said he did and ran thence north 75 east to the point where the Lang league line crosses the north line of said House survey, he would not have found Crystal Creek west of that point and the length of his line would have been only 700 varas instead of 1275 varas as described in his field notes. Here adherence to the presumption of Harper's presence at the northwest corner of the House Remainder survey makes false the description of a natural object and causes another unreasonable discrepancy in distance. The west line of the Lang league was easily susceptible of location by creek crossings on that and other lines of the league. Harper evidently was on the league line at the northeast corner of the Slade survey, for he describes that corner in his field notes as being in a dense thicket of undergrowth, and the distance on the ground between that corner and the northern northwest corner of the Slade survey (points E and F on the sketch) is 4181 varas, which is only 28 varas in excess of the distance called for in the field notes.

■ The several ambiguities and difficulties developed by the application to the ground of the field note descriptions of the three lines of the Slade survey nearest to the northwest corner of the Ransom House Remainder survey overcome the presumption that Harper went on the ground to that corner and thoroughly demonstrate that he did not go there. The reasonable conclusion from the undisputed facts is that, if Harper surveyed any part of the south line of the Slade survey on the ground, he ran north 75 east 3000 varas from the beginning corner, assumed that he was then at or near the northeast corner of the Stewart survey, marked a corner there, went no farther on the ground in locating the south line of his survey, and prepared the field note description of the second and third lines by a process of calculation or mapping from the field notes of the several surveys made by Rankin and the field notes of the Ransom House Remainder survey. Harper's description of one of the bearing trees at the northwest corner of the House Remainder survey obviously was copied from the field notes of that survey, and his description of the crossing of Crystal Creek at 1100 varas was undoubtedly obtained from the same field notes rather than from the work on the ground. Wade's field notes of the north line of the Ransom House Remainder survey, running west from its northeast corner, describe the full length of the line as 3731 varas and the distance from the northeast corner to the third and last crossing of Crystal Creek as 2631 varas. The difference is 1100 varas.

The other proposition presented by defendants in error in support of the trial court's judgment is that, even if Harper did not go on the ground to the northwest corner of the House Remainder survey, the Slade survey must be so constructed as to satisfy the call for the northwest corner and the north line of said House survey, which had been surveyed and marked on the ground seven or eight years prior to Harper's survey of the Slade, and the call for adjoinder must be given controlling effect over the calls for course and distance. The Court of Civil Appeals approved this proposition and made it the basis of its affirmance of the trial court's judgment.

■ The proposition announces a correct rule of boundary law applicable in the absence of evidence proving that the call for adjoinder was made in mistaken belief as to the location of the adjoinder, but where the facts conclusively show that the surveyor through mistake or by conjecture called for the adjoinder, the call for adjoinder does not control over course and distance, even though the line or corner called for was marked.

In such situation the call for adjoinder will be rejected, as inserted by mistake, and controlling effect given to course and distance from known and undisputed corners, when under the facts of the particular case such construction of the survey is "most consistent with the intention to be derived from the entire description." This method of construction by the rejection of a call for adjoinder inserted by mistake is most consistent with the true intention if its effect is to harmonize the other terms of the field notes and to disregard as few of the calls as possible. See: Wilson v. Giraud, 111 Texas, 253, 264, 231 S. W., 1074; Porter v. State, 15 S. W. (2d) 191, 193; Finberg v. Gilbert, 104 Texas, 539, 547, 141 S. W., 82; Gerald v. Freeman, 68 Texas, 201, 204; State v. Talkington, 274 S. W., 314; Cox v. Finks, 41 S. W., 95, 99; Gilbert v. Finberg, 156 S. W., 507; Lafferty v. Stevenson, 135 S. W., 216, 220; Lomax v. Rowe, 3 S. W. (2d) 498.

■ The rule last stated was announced in Wilson v. Giraud, supra, and in Porter v. State, supra, and there applied to a state of facts strikingly similar to those in the present case. It was contended that the call in the field notes of the Smith survey for the north line of the Barrow survey should control over course and distance. The north line of the Barrow survey was a marked line with identified bearing trees at its eastern terminus. It was held, however, in both cases that the call for such adjoinder should be rejected and the Smith survey should be constructed by course and distance from the southwest corner of the Bloodgood league and the south line of the Ellis league, because it was apparent that the call for the north line of the Barrow survey was made under a mistaken belief as to its location, induced by the official maps, which placed the north line of the Barrow survey where the call for distance in the Smith field notes would reach it. In so holding, Associate Justice Greenwood, who wrote the opinion in Wilson v. Giraud, afterward approved and followed in Porter v. State, said: "By construing the call for the north line of the B. Barrow survey as a call for that line as it was at the time designated on the official maps, and as the Barrow field notes pointed to its location by the call to run with the south line of the Bloodgood league, is to prevent any repugnancy between the calls of the Smith patent."

In the present case the official Land Office map of 1844, as well as the later official Land Office maps made before the facts on the ground were developed, showed the Ransom House Remainder survey from 500 to 600 varas farther west or

nearer the San Jacinto River than it is in fact located. As district surveyor of the Montgomery Land District Harper should have been familiar with the official map. If he was not, he would have acquired the same erroneous belief as to the location of the House Remainder survey by mapping or calculating its position from its field note connection to the southeast corner of the W. C. C. Lynch survey and from the field notes of the Lynch, Bryan, Stewart and Joseph House surveys. The southeast corner of the W. C. C. Lynch survey, as identified by the surveyors who testified for both parties, is more than 500 varas farther east and away from the river than it appears to be when its location is fixed or mapped from its field note connection to the Bryan survey and thence to the river according to the distances in the field notes of the Bryan survey. Harper was undoubtedly ignorant of the existence of this excessive distance on the ground. His field notes of the Slade survey, when applied to the ground, and the undisputed testimony as to the location of the northwest corner of the Ransom House Remainder survey when it and the surveys to which it connects are given their map position (platted in accordance with their field notes without reference to the location of natural objects or other facts on the ground) conclusively prove that Harper in preparing his field notes of the Slade survey accepted the map position of the House Remainder survey. Accordingly, as in Wilson v. Giruad and Porter v. State, the call for the northwest corner and the north line of the House Remainder survey is to be construed as a call for such corner and line as they were at the time designated on the official map, or, in other words, for such corner and line where they appear to be located when the surveys are mapped or platted from their field notes.

Further similarity exists between Wilson v. Giraud and Porter v. State and the present case by reason of the fact that here, as there, the rejection of the call for adjoinder follows the rule that when all calls cannot be observed as few as possible should be disregarded, rids the survey of repugnancy in its other calls, and harmonizes its terms. When the mistaken call for the House Remainder survey is disregarded, the first line of the Slade survey and the second line are given their correct courses and distances; the third line running east to the Lang league is 1301 varas in length, an excess of 26 varas, which is substantially the same as the excess in the length of the eastern portion of the north line of the Slade survey; and the length of the fourth line along the Lang league line is

1938.5 varas, an excess of 53.5 varas above the field note distance. On the other hand, if effect is given to the call for the northwest corner of the Ransom House survey, the first line of the Slade survey has an excess of 550 varas in length; the second line must be run on a course exactly the reverse of that called for in the field notes; the third line is but 700 varas in length, when it should be 1275 varas; and the fourth line along the Lang league line is excessive in length to the extent of 213 varas. If the call for the corner of the House Remainder survey is broken and the south line of the Slade survey is constructed by course and distance, the Slade survey has the configuration given it by its field notes and sketch and has its full acreage, with a small excess; whereas, if the other calls are subordinated to the call for the corner of the House Remainder survey, violence is done to the configuration of the survey and its acreage is substantially increased above its proper quantity.

A circumstance indicating that Harper did not attach controlling importance to a connection with the House Remainder survey is the fact that his sketch on the field notes of the Slade survey shows all of the several surveys with which he undertook to connect his survey except the House Remainder survey.

The facts which have been discussed conclusively prove Harper's mistake as to the location of the Ransom House Remainder survey and bring the case within the rule of Wilson v. Giraud and the other decisions above cited. The land in controversy lies outside of the Slade survey and between the south line of that survey and the north line of the House Remainder survey.

The facts with respect to possession of the Slade survey by those who have owned or claimed to own it have not been fully developed, but, to the extent that they are developed, they are in accord with the conclusion here expressed as to the true location of the south line of the survey. On January 15, 1907, a decree of partition affecting the Slade and the other surveys was entered in the District Court of Montgomery County. By the survey which was made and used in the making of that partition between those who were adjudged to be the owners of the land, the eastern portion of the south line of the Slade survey was located and marked so as substantially to fit its location when it is constructed, as we conclude it is correctly constructed, by course and distance from the southeast corner of the Joseph House survey. The southeast corner of the Slade

survey as fixed in that partition suit is the northeast corner of the 15.77 acre tract in controversy herein. It further appears without dispute that there is an old marked line which runs north 75° 45' east from the southeast corner of the Joseph House survey 3000 varas, thence north 15' west 75 varas and thence north 73° 40' east 1290 varas to the southeast corner of the Slade survey as described in the judgment of partition and that the South Texas Construction and Development Company, which owned or claimed to own the timber on the Slade survey, recognized that line in cutting the timber in 1918.

Our decision is not in conflict with Camp v. Gulf Production Company, 122 Texas, 383, 61 S. W. (2d) 773, because in that case, as disclosed by the record, the opinion of the Court of Civil Appeals and the opinion of the Supreme Court, there was no evidence of mistake except an excess, in distance, of 175.2 varas in approximately five miles, about 35 varas per mile. Such inconsiderable excess is not of itself evidence that the surveyor was mistaken in the location of the adjoinder for which he called, but, when there is no other evidence of mistake, is usually, as it was in Camp v. Gulf Production Company, taken to mean that the mistake was in the measurement or in the calculation of the distance.

The judgments of the district court and the Court of Civil Appeals are reversed. Judgment is here rendered that plaintiff in error recover of defendants in error the title and possession of the tract of land in controversy as the same is described in plaintiff in error's second amended original cross action, subject, however, to the oil and gas lease executed by plaintiff in error to defendant in error, Franks; that plaintiff in error have judgment against defendants in error establishing its ownership of the royalties accrued and to accrue under the terms of said oil and gas lease, and that it take nothing, except said royalties, by its action for damages; and that defendant in error, J. E. Franks, take nothing by his cross action against defendant in error, Humble Oil & Refining Company, no evidence having been offered supporting said cross action.

Opinion adopted by the Supreme Court March 25, 1936.

Rehearing overruled June 24, 1936.