## STATE v. FRANKS et al.

### No. 8642.

Court of Civil Appeals of Texas. Austin.

Nov. 17, 1937.

Rehearing Granted in Part and in Part Denied Feb. 9, 1938.

Wm. McCraw, Atty. Gen., and H. Grady Chandler, Asst. Atty. Gen., for the State.

E. Cartledge, Solon Walker, Ike D. White, and Dan Moody, all of Austin, for appellees J. E. Franks and E. Cartledge.

Pitts & Liles, of Conroe, and Vinson, Elkins, Weems & Francis, DeWitt M. Gordon, Jr., R. E. Seagler, and McComb & Marsh, all of Houston, for other appellees.

BLAIR, Justice.

This is a boundary case. It involves the location on the ground of the north boun-

dary line of the Ransom House survey in Montgomery county. The State sued to recover two tracts of land, being tract No. 1 for 5.23 acres and tract No. 2 for 7.62 acres, as shown by the shaded area on the following sketch of its map:

The State, joined by defendants Franks and Cartledge who owned mineral leases on the two tracts, contended that the north boundary line of the Ransom House survey began at point "B" on the map and ran in a straight line to point "C." Appellees, all defendants except Franks and Cartledge, contended that the north line of said House survey began at point "A" and ran to point "B" as shown on the following sketch of their map:

That is, appellees contended the line ran from the northeast corner of the Ransom House through the southeast corner of the John McHorse survey, the southeast corner of the International & Great Northern Railroad Company survey No. 10, the southeast corner of the International & Great Northern Railroad Company survey No. 11, the southeast and southwest corners of the Watson, Hooper, and Real surveys, and along the south line of

PLAT SHOWING THE NORTH WEST PART OF THE RANSOM HOUSE ONE THIRD LEAGUE & LABOR SURVEY IN MONTGOMERY COUNTY, TEXAS ALSO SHOWIN THE TWO SMALL TRACTS ONE OF 5.23 ACRES THE OTHER OF 7.63 ACRES, CALLED SCHOOL LAND

the 15.77-acre tract recovered by the State in its case against Sullivan, 127 Tex. 525, 92 S.W.2d 228, as said line, and those surveys and tracts are delineated on their map.

The jury found that the true north line of the Ransom House survey was the line delineated on appellees' map from "A" to "B," and judgment was accordingly rendered that the State, Franks, and Cartledge take nothing by their suits.

The State, joined by Franks and Cartledge, makes two contentions here, as follows:

(1) That the Supreme Court in the case of State v. Sullivan, 127 Tex. 525, 92 S.W. 2d 228, located, fixed, and established the north line of the Ransom House survey in question at a point 150 varas south 15 east from the most northern south line of the Theodore Slade survey; and that therefore the court erred in not rendering judgment for the State for the two tracts of land in controversy under the rule of stare decisis as applied in this state.

(2) That if it should be held that the Supreme Court did not locate and fix the north boundary line of the said Ransom House survey in the Sullivan Case, then the undisputed evidence as a matter of law located and fixed it on the ground as the straight line running from point "B" to point "C," as shown on the State's map.

We have reached the conclusion that the Supreme Court did not intend in the Sullivan Case to locate and fix the north boundary line of the Ransom survey on the ground. However, we are of the view that the undisputed evidence as a matter of law fixed or located said boundary line on the ground as the line from point "B" to point "C" on the State's above map. Since we have so concluded we will discuss only briefly the stare decisis question. Suffice it to say that a sketch accompanies the court's opinion in the Sullivan Case, 127 Tex. 525, 92 S.W.2d 228, 230, 234, and that the statements of the opinion referring to same and relied upon by appellant to fix and locate said boundary line are as follows: "The land in controversy lies outside of the Slade survey and between the south line of that survey and the north line of the House Remainder survey. * * * The tract of land in controversy is the shaded area on the accompanying sketch, with its corners designated by the letters C, D, R, and S. * * * The two expert witnesses who testified for the opposing parties agree that

the northwest corner of the Ransom House Remainder survey is at the point indicated on the sketch by the letter C. * * * The trial court's judgment, in accordance with the position taken by the defendants in error, had the effect of fixing the position of the south line of the Slade survey along the lines marked by the letters A, B, C, and D. * * * The area covered by the surveys shown on the accompanying sketch was heavily timbered, but has been cut over three times, and none of the bearing trees described in the field notes of the several surveys can be found. The solid lines on the sketch represent the lines as to the location of which there is no controversy. * * * The south line of the Slade survey is described in the field notes as beginning at the southeast corner of the Joseph House. survey (point A on the sketch) and running thence north 75 east with the north line of the Stewart survey 3,000 varas to the west boundary line of the Ransom House Remainder survey. When this line is run on the ground from the undisputed beginning point, it does not reach the west line of the Ransom House Remainder survey at 3,000 varas. It must be extended to a total distance of 3,550 varas to reach a point (B on the sketch) as far east as the west line of the said House survey. When the line is thus. extended, its eastern terminus falls, not on the west line of said House survey, but 75 varas north of its northwest corner. The second line, of the Slade survey is described in the. field notes as running north 15 west with the House Remainder survey 75 varas to the northwest corner of the same. Even if the first line is extended .550 varas, it is necessary to reverse the call and run the second line south 15 east in order to reach the northwest corner of the said House survey (point C on the sketch)."

The court then stated that the undisputed testimony showed that the northwest corner and north line of the Ransom House survey were 150 varas south of the most southerly south line of the Slade survey.

If the quoted statements were all that were made in the opinion, we would be inclined to the view that the Supreme Court necessarily fixed and located the north boundary line of the Ransom House survey under the rule of stare decisis, which rule is that where the Supreme Court in a suit necessarily locates or fixes the boundary of a survey, that location is controlling in all subsequent suits involving the same boundary line, whether or not the parties

and the property are the same. But in the Sullivan Case the court carefully limited the scope of its decision as follows: "The particular question for determination is whether a tract of 15.77 acres of land lies within the bounds of, or outside of, the Theodore Slade survey in Montgomery county. * * * The problem presented is to determine from the undisputed facts the true location of the boundary lines of the Theodore Slade survey, particularly of the eastern portion of its south boundary line."

 It is evident that the court intended to only determine where the south boundary line of the Theodore Slade survey was located on the ground. It is true that one call of the Theodore Slade field notes was for the west boundary line of the Ransom House and another call was for the northwest corner; but the court found that the call in the Slade field notes could not possibly reach the Ransom House west line and broke the call. The statements first above quoted were therefore clearly in explanation of why the call for adjoinder with the Ransom House survey in the Slade field notes was made by mistake; and such statements were made upon the assumption that "the two expert witnesses * * * agree that the northwest corner of the Ransom House" was at the point designated "C" on the map.

It may also be observed in this connection that the State originally sued for the 28 acres represented by the 15.77-acre Sullivan tract and the two tracts in suit, but by agreement and court decree the two tracts in suit were severed from the tract in suit in the Sullivan Case; the parties agreeing and the court decreeing "that this order be and the same is hereby entered without prejudice to the right of any party to this lawsuit to make any contention with reference to the north boundary line of the Ransom House Remainder Survey in cause No. 52,929-½," which is this cause. This order is not referred to as an estoppel on the part of appellant to here contend that said boundary line was fixed by the decision in the Sullivan Case, but to show that the court was considering and limiting its decision in that case to the 15.77-acre tract lying south of the south boundary line of the Slade survey.

 The undisputed evidence locating and fixing the north boundary line of the Ransom House survey on the ground as the straight line running from point "B"

to point "C" on the State's above map is as follows:

The James Wilson and the Ransom House surveys were made by Surveyor John M. Wade. The field notes of the Wilson survey were made January 18, 1839, and the field notes of the House were made January 19, 1839. The Wilson survey forms three lines of the House survey. The field notes of the Ransom House survey are as follows:

"Beginning on the south east corner of W. C. C. Lynch's Survey and Northern boundary of Lemuel Smith 2/3 League Survey, a stake from which a pine 24 inches in dia. marked S bears S 40 deg. W. 8 varas dist.

| varas x | "Thence N 60 deg. E. with north boundary of Smith Survey |
|---|---|
| 3863 | to its corner a stake from which a pine 12 inches in dia. marked S. bears S. 12 deg. W. 2-5/10 varas dist. and a pine marked (maltese cross) bears N. 86 deg. W. 4 varas dist. |
| | "Thence North 15 deg. West |
| 2969.5 | to third corner set post from which a Magnolia 10 inch dia. marked (maltese cross) bears S. 65 deg. W. 17 varas dist. and a pine 18 inches dia. marked (maltese cross) bears S. 23 deg. W. 6 varas dist. |
| | "Thence South 75 deg. West |
| 40 | to East prong of Crystal Creek, 6 vrs. wide, S. |
| 451 | to Crystal Creek 8 vrs. wide, runs south |
| 2631 | to West prong of Crystal Creek 5 vrs. wide, runs so. |
| 3731.8 | to 4th corner set a post from which a pine 8 inches in dia. marked (maltese cross) bears south 27 deg. W. 2 varas dist. And a pin oak 12 inches dia. marked (maltese cross) brs. south 45 deg. east 7 vrs. dist. |
| | "Thence So. 15 deg. East |
| 1468.8 | to 5th corner intersected northwest corner of Wilson's survey, a post from which a pine 26 inch dia. marked D.L. bears S. 73 deg. 30' E. 6 vrs. dist. And a White Oak marked W. 24 inch in dia. bears So. 85 deg. E. 9 varas dist. * * *" |

The pertinent portions of the field notes of the Wilson survey are as follows:

"Beginning on the eastern boundary of W. C. C. Lynch's Survey 600 vrs. N. 15 deg. W. from its southeast corner. Beginning corner, set post from which an Elm 6 in dia. mkd. W. brs. N. 46 deg. E. 8 vs. dist. and a holly 6 in. dia mkd. D L brs S 55 deg E. 1-2/10 vs dist;

"Thence North 15 deg W with said survey 1116 vs to its corner 1900.8 vs to 2nd corner set post from which a pine 26 in dia mkd D L brs S 73 deg 30' E 6 vs dist. and a white oak 24 in dia marked W brs S 85 deg E 9 vs dist;

"Thence North 75 deg E 940 vs to west prong of Crystal Creek 8 vs wide S 1900.8 vs to 3rd corner set post from which an iron wood 8 in dia mkd D L brs S 5 deg W 1 va dist and a holly 8 in dia marked W vrs N 48 deg E 2-5/10 vs dist;

"Thence South 15 deg E 300 vs to Crystal Creek 9 vs wide runs South west 1900.8 vs to 4th corner set post from which a pine 28 in dia mkd D L brs N 44 deg W 2 vs dist and a pine 36 in dia mkd W brs N 15 deg E 2 vas dist. * * *"

"Scale 4000 varas to an inch variation 9 deg. 30′ E."

The Ransom House survey is senior to each of the surveys sought to be tiered on its north line as delineated on appellees' above map. The original surveyors of the surveys involved, except possibly the Hooper, are dead. Two licensed surveyors testified (Mr. Atkinson for the State and Mr. Hall for appellees) how they located the north line of the Ransom House. These surveys were made in 1932. Surveyor witness Atkinson placed the line at approximately the place where the two expert witnesses agreed that said line was located in the Sullivan Case.

In the location of the north line of the House survey on the ground, Atkinson followed the calls of its field notes, which began at the southeast corner of the Lynch survey and thence north 60 east 3863 varas with the north line of the Smith survey to the southeast corner of the said House, and marked on the State's map at point "A." Atkinson began his survey at this southeast corner, because, although not marked by any of the original markings of the original surveyor, it is now and has been for many years marked and recognized on the ground, and has been "recognized by every surveyor so far as reports regarding the ground" and records show; and because there was no indication from any source that the original surveyor or any subsequent surveyor had ever taken any other point for the southeast corner of the House survey. This testimony of Atkinson was not controverted. The call from this established and recognized corner is as follows: "Thence North 15 deg. West 2969.5 to third corner set post from which a Magnolia 10 inch dia. marked (maltese cross) bears S 65 deg. W. 17 varas dist. and a pine 18 inches dia. marked (maltese cross) bears S. 23 deg. W. 6 varas dist."

Atkinson testified: "I began at A on the map,—on the ground corresponding to A on the map, ran a connecting line between that point and B, with a transit and steel tape in order to determine the exact course of the straight line between those two points. Then I turned a right angle, 90-deg. to the left, and ran a straight line through to C."

The east line of the House is now and for many years has been well marked on the ground. Point "B" on the map represents the northeast corner of the House survey. It is marked by the original bearing tree, described as a "Magnolia 10 inch dia.," now 30 inches in diameter; and as to this marked corner being the original located and established corner called for in the House field notes there is no dispute. From this undisputed corner the field notes called to run as follows: "Thence South 75 deg. West 40 to East prong of Crystal Creek, 6 vrs. wide, S. 451 to Crystal Creek 8 vrs. wide, runs south 2631 to West prong of Crystal Creek 5 vrs. wide, runs So. 3731.8 to 4th corner set a post from which a pine 8 inches in dia. marked (maltese cross) bears south 27 deg. W. 2 varas dist. And a pin oak 12 inches dia. marked (maltese cross) brs. south 45 deg. east 7 vrs. dist."

Atkinson testified: "I adopted the East line as a base and turned at right angle off of it. * * * The variation which I read on my needle' was approximately 9 deg. 30′ E."

He ran on a variation of 9 degrees 30′ east because the field notes of the Wilson made the day before the House field notes by the same surveyor show the Wilson to have been run on that variation and show that their north lines were parallel. The first call for a natural object on the north line is for the east prong of Crystal creek 6 varas wide at 40 varas. Atkinson found it at 40 varas. The next call is for the east prong of Crystal creek 8 varas wide at 451 varas. Atkinson found it at 460 varas; a difference of 9 varas. The next call is for the west prong of Crystal creek at 2,631 varas. Atkinson found it at 2,630; 1 vara difference. The length of the north line called for in the field notes is 3731.8; varas. Atkinson ran this line 3779 varas to locate the northwest corner of the House survey at the point marked "C" on the State's above map; this being the point where said north line intersected the west boundary line of the Ransom House survey at a point 1,468.8 varas northwest from the most westerly southwest corner of the Ransom House survey, marked "D" on the

State's map and now marked by an iron pipe, from which a 38' black gum, marked X and four hacks in the form of a square, bears north 55 east 1.2 varas, and also other witness trees of subsequent date and lesser age. The field notes call for this corner of the House as follows: "Thence So. 15 deg. East 1468.8 varas to 5th corner intersected northwest corner of Wilson's Survey, a post from which a pine 26 inch dia. marked D. L. bears S. 73 deg. 30' E. 6 vrs. dist. And a White Oak marked W. 24 inch in dia. bears So. 85 deg. E. 9 varas dist."

Atkinson made his survey of the west line of the House by going to this most westerly southwest corner of the Ransom House, which was also the northwest corner of the Wilson survey, and found same marked and fenced, and which had been recognized by every one for a considerable length of time, although none of the original bearing trees called for at the fifth corner of said House were located. Atkinson then ran back this line the called distance 1468.8 varas north 15 west from the most westerly southwestern corner of the Ransom House, and he reached the point designated on the State's map as "C" at "exactly 7/10 of a vara of the called distance 1468.8 varas—I don't remember whether it was over 7/10 of a vara or short 7/10 of a vara, but practically the exact feet * * * approximately 2 ft.,-24 inches." This northwest corner of the House marked "C" on the State's map is within a few varas of its northwest corner, as shown on the plat in the case of State v. Sullivan, supra, and with reference to which the court stated: "The two expert witnesses who testified for the opposing parties agreed that the northwest corner of the Ransom House Remainder survey is at the point indicated on the sketch by the letter C." That is, the map in the Sullivan Case showed the northwest corner of the House survey to be at the point marked "C" and at a point 150 varas south from the south line of the Slade survey as fixed by the court. Atkinson's survey on the ground, as above detailed, placed this northwest corner at 160 varas south of the south line of the Slade survey as that line is established in the Sullivan Case, thus creating the 5.23-acre vacancy between the House north line and the south line of the Franks' 15.77-acre tract as that line is fixed in the Sullivan Case, and being tract No. 1 sued for by the State herein.

Atkinson made his survey September 1 to 9, 1932. His report filed with the Land Commissioner, dated September 12, 1932, showed that he made the survey as above detailed, and his map accompanying the report is substantially the same as the State's above map. Both his report and his evidence on this trial showed without material dispute that the southeast, the northeast, the most southern northwest corners, and the east line of the Ransom House survey are well marked and recognized on the ground. Atkinson took the marked east line as a base, and following the calls in the field notes he ran at right angle to it from the known and established northeast corner, crossing Crystal creek three times at approximately the places called for in the field notes, and at approximately the distance called for reached the northwest corner of the House survey at a point within seven-tenths of a vara of the call distance from its most southern marked and recognized northwest corner. In thus making his survey, Atkinson followed well-recognized rules of construction of surveys and followed the footsteps of the original surveyor as carefully, closely, and accurately as might be expected in establishing a line the length of the north line of the House survey; and we regard the evidence as establishing the north line of the House survey as the straight line marked "B" to "C" on the State's map as a matter of law.

Appellees attempted to establish their claimed north line of the House by following only one call of the House field notes and by surveying and locating at different times the southwest and southeast corners and south lines of the junior surveys which called for the north line of the House as their south boundary lines. Since these were all junior surveys, it was incumbent upon appellees to show some good reason for not following the footsteps of the original surveyor as determined by the original field notes of the House survey. Neither the report nor testimony of appellees' surveyor witness Hall, nor the report of Surveyor Evans, relied upon by appellees, showed that either surveyor in attempting to establish the north boundary line of the House survey followed the footsteps of the original surveyor, but conclusively showed that they did not follow the field notes and lines of the House survey as made by the original surveyor. Witness Hall began his survey at the established northeast corner of the House and testified that he ran

south 75° west on a variation of 8° and 30', instead of 9° and 30', which was clearly shown to be the variation used by the original surveyor of the House in surveying its north line. Witness Atkinson testified without dispute that between a line run at a variation of 8° 30' east from the northeast corner and a line run at 9° 30' east would be a difference of approximately 100 feet to the mile, or approximately 36 varas to the mile, and that the line run on the 8° 30' variation would be farther north than the line run at 9° 30' east variation. Witness Hall gave no reason for taking a variation different from that of the original surveyor, except that probably in the course of time the variation would change; whereas the undisputed evidence showed that Atkinson ran the survey on a variation of 9° 30' east approximately, and reached every call for Crystal creek at approximately the distance called for in the original field notes of the House survey; and intersected the west line at the distance called from its most southern northwest corner.

■ The testimony is also undisputed that the original markings of the M. W. Real, W. N. Hooper, and J. T. Watson surveys of their southwest and southeast corners stop them before they reach the Ransom House north line as established by Atkinson's resurvey of said line. The rule is settled that a junior survey must be made to conform to and harmonize with the lines and calls for older surveys, because the boundaries of the older surveys cannot be extended or varied to satisfy the calls of a junior survey. It is apparent that in making the original survey of the Real and in marking and establishing its southern corner on the west prong of Crystal creek, the surveyor made a mistake by stopping his line at the point where he first reached the west prong of Crystal creek and assumed, without any survey of the north line of the Ransom House, that that point was the point called for in the Ransom House field notes. Witness Hall also testified that he was on the ground for the purpose of locating the south lines of some of the junior surveys, and he does not claim to have run a line at right angle with the east line of the House survey, as called for in its field notes. The evidence is also undisputed that a line run from the recognized northeast corner of the House on the course of south 75 west at a variation of 8° 30' east through the south line of the junior surveys immediately to the north of the

House, and which called for its north line, misses every natural object called for in the original field notes of the north line of the House by a substantial distance, except one, which is the first call for Crystal creek at 40 varas from the northeast corner of the House. It is also undisputed that such a line will cross Crystal creek five times instead of three, as called for in the original field notes of the House survey, and that it will reach the northwest corner of the House at 1508.5 varas north of its most southern northwest corner, instead of 1468.8 varas as called for in the field notes of the House, or approximately 40 varas farther north. The west line of tract No. 1 of 5.23 acres is 41.6 varas and its east line 43 varas as established by Atkinson. Not only does such north line of the House cross the west prong of Crystal creek three times instead of one as called for in the original field notes, but crosses it at a point 2557.5 varas west of the northeast corner of the House instead of 2631 varas as called for in the original field notes of the House, a discrepancy of 73.5 varas; and such a line reaches the second call for Crystal creek 16 varas farther than called for in the original field notes. The report of Atkinson filed with the Land Commissioner in 1932, and stating that the southeast corner of the House, its east line, its northeast corner, its most southern northwest corner, and its west line from that corner to its most northern northwest corner were well marked and established on the ground, was not controverted in any respect. Atkinson made the statement in his report that he found it impossible to make the south boundaries of the junior surveys conform to the north boundary line of the House survey, because, "A straight line passing through the original corners as heretofore mentioned and identified upon the ground extended northeasterly will intersect the north boundary line of the Ransom House at or near the southwest corner of the John Mac-Horse Survey, and continued in a straight line, will pass south of the original northeast corner of the Ransom House Survey as heretofore described and identified on the ground. * * * These lines cross the creek three (3) times near the southeast corner of the W. M. Real Survey, whereas in the original field notes of the House only one (1) crossing is called for in this vicinity."

This report was filed in 1932 as a public document and was not contradicted on this trial. The credibility of Witness Atkinson

was attempted to be raised by questions as to why he changed and filed corrected field notes twice with regard to the 28-acre vacancy first claimed by Franks and the State to be located between the north boundary line of the House and the south boundaries of the Watson, Hooper, Real, and Slade surveys. But the undisputed evidence shows that these corrections were made at the suggestion of the Land Office, and the undisputed evidence shows that later the Land Office issued mineral leases, not only to the 15.77-acre tract recovered by the State in the Sullivan Case, but also both for the 5.23-acre and 7.62-acre tracts which lie south of the Franks, Real, Hooper, and Watson surveys as established by the undisputed evidence in this case.

■ The rule with regard to the establishment of a boundary line, where the facts are undisputed, is stated in Taylor v. Higgins Oil & Fuel Co., 2 S.W.2d 288, 303, as follows: "If the facts are not in dispute and the only question involved is the correct application to the facts of well-known principles of law, the location of the boundary is a question of law for the court, and a verdict should be instructed; that is, the court cannot weigh the evidence of one party against the other and find that one theory of the evidence is true and the other false, but, conceding the truth of the testimony, must determine its legal effect by the well-known principles of law governing boundary suits."

We conclude that the State proved its title to the two tracts of land sued for, and reverse the judgment of the trial court and here render judgment for the State for title and possession of the land, and for Franks and Cartledge for their mineral lease claims.

Reversed and rendered.

On Appellees' Motions for Rehearing.

By its motion for a rehearing, Humble Oil & Refining Company shows that it does not contest the mineral lease of J. E. Franks on the 5.23 acres of land in controversy, if we adhere to our decision awarding title to the State of Texas. By his motion E. Cartledge shows that he has no mineral interest in the land, and prays that judgment be rendered for J. E. Franks awarding the mineral lease to him. By its reply to these motions, the State of Texas shows that it does not contest the mineral lease of J. E. Franks. Under our judgment awarding title to the land to the State of Texas, these are the only parties to the suit who could have any interest in the mineral lease; and all motions that judgment be rendered for J. E. Franks for his mineral lease claim are granted. The motion of Humble Company as against the State of Texas is overruled. The former opinion on rehearing is withdrawn, and the portion of the original judgment awarding a mineral lease to E. Cartledge on the 5.23 acres of land is set aside, and it is hereby decreed that he has no mineral interest in the land; and judgment is here rendered for J. E. Franks for his mineral lease claim.

The motions are granted in part, and in part overruled.

Granted in part, and in part overruled.