## PEAL v. LULING OIL & GAS CO. et al.
### No. 10491.

Court of Civil Appeals of Texas.
San Antonio.

July 26, 1940.

Rehearing Denied Feb. 14, 1940.

Second Motion for Rehearing Denied
March 6, 1940.

Kazen & Kazen and Mann & Mann, all of Laredo, and Black, Graves & Stayton, of Austin, for appellant.

George Cannon and Harold A. Neuhaus, both of San Antonio, for appellees.

MURRAY, Justice.

This suit was instituted by J. B. Peal, as plaintiff, against Luling Oil and Gas Company and others, as defendants, to remove cloud from the title to a one-half royalty interest in a certain 70.236-acre tract in Duval County, and, in the alternative, to reform (because of mutual mistake) the description incorporated in a royalty conveyance executed by appellant, Peal, to appellee, Luling Oil and Gas Company, so as to exclude such 70.236-acre tract from such royalty conveyance.

Magnolia Petroleum Company is the owner of an oil and gas lease executed by appellant, Peal, prior to the time of the execution of the royalty conveyance in question to the Luling Company. The Magnolia lease covers the 70.236-acre tract in dispute, as well as other lands. The validity of the Magnolia lease is not questioned. The dispute is between Peal and the Luling Company, and it involves the question of who is entitled to one-half of the royalties produced under the Magnolia lease upon the 70.236-acre tract, or, in other words, whether or not the 70.236-acre tract was included in the royalty conveyance.

The trial was to a jury but at the conclusion of the evidence the court granted Luling Company's motion for an instructed verdict. Judgment was entered decreeing, among other things, that Peal take nothing by reason of his suit. J. B. Peal has prosecuted this appeal from that judgment.

The real question to be here decided is whether or not the 70.236-acre tract herein involved is included within the description of the land set forth in the royalty deed from Peal to Luling Company, dated April 11, 1936.

The description contained in that conveyance is as follows:

"The East half of the Southeast quarter of Survey 72, Certificate 436, Block 1, Original Grantee C. C. S. D. & R. G. N. G. Railway Company, which East half of the Southeast quarter of such Survey contains eighty (80) acres of land, more or less, which land is situated partly in Webb County and partly in Duval County.

"Also the following described portion of Survey 383, Certificate 36/99, Abstract No. 1914, Original Grantee Mary H. Chatham, situated in Duval County, Texas, which portion of said Survey 383 covered by this lease is described as follows:

"Beginning at the Northeast corner of above described Survey 72 for the Northwest corner hereof;

"thence East along the South boundary line of adjoining Survey 115 and an extension thereof to the East to a point in the West boundary line of Survey 796 for the Northeast corner hereof;

"thence South along the West boundary line of said Survey 796 to its Southwest corner for the Southeast corner hereof;

"thence West along the North boundary line of Survey 794 and an extension thereof to the West to a point in the East boundary line of said Survey 72 for the Southwest corner hereof;

"thence North along the East boundary line of said Survey 72 to the place of beginning, and containing one hundred and forty three (143) acres of land, more or less."

The above description was prepared by G. C. Mann, Esq., an attorney of Laredo, after the land had been indicated to him on what is called in the record the Luling map, by the drawing of a red line around the land, a royalty interest in which was to be conveyed by Peal to the Luling Company.

The trouble here arose as a result of Surveys 796 and 794 not being located on the ground as they were supposed to be located, and as they were shown to be located by the official map in the General Land Office. The land covered by the royalty deed is in Survey 72, and Survey 383. There is no dispute about the location of that part of the land which lies in Survey 72. The entire dispute is with reference to the land located in Survey 383.

Below is a sketch showing the relative position of the various surveys, which sheds light upon the land involved:

The dotted lines show the supposed location of Surveys 796 and 794 at the time the royalty deed was executed. The land included in the rectangle A. B. C. and D. indicates the land claimed by Luling Company, while the rectangle A. E. F. and G. is the land which Peal contends was described by the royalty deed. Thus the question arises in the tract E. B. C. D. G. F. included in the royalty deed.

It will be noted that there are no calls for course and distance, nor for specific number of acres. All calls are either to follow certain boundary lines, or the extension thereof, or for adjoinder. If the description of the land is applied to

the calls for adjoinder as Surveys 796 and 794, as they were supposed to be located at the time the deed was executed, then Peal's contention would be correct, but if the description is applied as those surveys were found to be actually located upon the ground, then the contention of the Luling Company must be upheld.

We have concluded that the description must be applied as Surveys 796 and 794 are actually located upon the ground, and that it cannot be applied as they were supposed to be located.

In arriving at this conclusion we first consider that there are no calls for course and distance, nor is there any call for a specific number of acres. The parties first agreed that the land should be surveyed and the number of acres determined and the consideration paid accordingly, but later this was abandoned and settlement had on the original estimate of 143 acres; the parties agreeing, in effect, that if there were more acres Peal would be the loser, and if there were less acres Luling Company would be the loser. Therefore, the calls for adjoinder and to follow certain survey lines is all the description we have.

We do not have here a conflict between course and distance and a call for adjoinder, as was the case in State v. Sullivan, 127 Tex. 525, 92 S.W.2d 228, and other similar cases. Here, if we disregard the call for adjoinder we have nothing. It is not a case of a conflict in calls, one of which must be disregarded, but a case where you must give weight to the call of adjoinder or render the description meaningless.

There is, however, some difficulty in applying the description on the ground, when Surveys 796 and 794 are given their true locations. There is no difficulty about the starting point. The northeast corner of Survey 72 is a definitely known point and easily located on the ground, as is also the south boundary line of Survey 115. The first call is as follows: "thence East along the South boundary line of adjoining Survey 115 and an extension thereof to the East to a point in the West boundary line of Survey 796 for the Northeast corner hereof."

It is apparent that when you go east along the south boundary line of Survey 115 and an extension thereof you will never reach the west boundary line of Survey 796, if Survey 796 is given its true location on the ground, but you would reach an extension of the west boundary line of 796 extended to the north. We conclude that in keeping with the testimony given by the surveyors this west boundary line should be extended to the north so as to complete this first call with an intersection of such extended line.

The second call is as follows: "thence South along the West boundary line of said Survey 796 to its Southwest corner for the Southeast corner hereof." The question here arises, are you going to the southwest corner of Survey 796 as it was supposed to be located, or as it is actually located? We have concluded that in the absence of any call for distance you must go to the true southwest corner of Survey 796.

The third call is as follows: "thence West along the North boundary line of Survey 794 and an extension thereof to the West to a point in the East boundary line of said Survey 72 for the Southwest corner hereof." It is true that when you leave the true southwest corner of Survey 796 and pass along the true north boundary line of Survey 794 and an extension thereof, you do not arrive at a point in the east boundary line of Survey 72, and in order to complete this call you would have to extend the east boundary line of Survey 72 to the south. We have concluded this should be done.

There is no trouble with the fourth call when you follow along the east boundary of Survey 72, as thus extended, and the east boundary of 72 to the place of beginning.

The only trouble in the field notes is caused by the fact that the map prior to 1936 showed the north boundary line of Survey 796 to be north of the south boundary line of Survey 115, while its true location on the ground is south of Survey 115, and the north boundary line of Survey 794 to be north of Survey 72, while its true location on the ground is south of Survey 72.

We have arrived at the above conclusions because it is apparent from the description given in the royalty deed, when taken in connection with all the surrounding facts and circumstances, that it was the intention of the parties to describe all of the land located in Survey 282 lying generally between Surveys 796 and 72, which was south of the south boundary line of Survey 115 and an extension thereof to

the east, and north of the north boundary line of Survey 794 and an extension thereof to the west. This is true because there were no calls for course and distance, nor for objects on the ground, nor for specific number of acres, and the only calls were to follow certain survey lines and for adjoinder of surveys which were senior to Survey 383.

In placing the above interpretation on the description contained in the royalty deed we have followed the rules laid down in the following cases: Stafford v. King, 30 Tex. 257, 94 Am.Dec. 304; Lilley v. Blum, 70 Tex. 704, 6 S.W. 279; Miller v. Southland Life Ins. Co., 68 S.W.2d 558; Gulf Production Co. v. Spear, 125 Tex. 530, 84 S.W.2d 452.

We can come to no other conclusion than that there being no call for distance, and no call for a specific number of acres, the call for adjoinder must be given effect.

The judgment is affirmed.

On Motion for Rehearing.

NORVELL, Justice.

In the motion for rehearing filed herein the appellant presents, among others, the contention that if the evidence in the case is not sufficient to establish appellant's right in and to the property sued for, it was nevertheless sufficient to raise a fact issue with reference to appellant's alternative count seeking a reformation of the royalty deed involved. Stated another way, it is contended that there was a jury issue as to the existence of a mutual mistake between the parties.

■■ The matters of law involved are comparatively simple. The mistake in order to justify a reformation must be mutual. 36 Tex.Jur. 746 and 750. It was therefore the burden of appellant to present evidence which would sustain a finding, or group of findings, by a jury, supporting the contention that the appellee, Luling Oil & Gas Company, intended to purchase the tract of land shown on the map included in the original opinion which is bounded by the letters A. E. F. and G.

■ Upon the trial, the following agreement was made by the parties: "It is further agreed that plaintiff (appellant) is not questioning the title acquired by defendant (appellee), Luling Oil and Gas Company, to the 80 acres of Survey 72, described in the royalty conveyance involved in this suit, and that the only dispute is the 70.236 acre tract of land out of Survey 383, described in plaintiff's pleadings."

The 70.236-acre tract of land covered by the stipulation is that tract indicated by diagonal lines on the map contained in the original opinion. This agreement eliminates any question of rescission. 7 Tex. Jur. 1011.

■ The question presented is whether or not there is sufficient evidence in the record to support a jury finding that the Luling Company did not intend to purchase the particular tract of land designated by the diagonal lines upon the map as above mentioned.

We have come to the conclusion that the evidence would be insufficient to support such a finding. In order to make clear the basis for such a holding it is necessary to state some additional facts disclosed by the record.

Appellee's brief herein contains a statement as to the various positions and locations of surveys surrounding Survey No. 383, which is involved here. This statement has been examined by us and found correct, and is as follows:

"On May 10, 1886, in the vicinity of the Webb and Duval County lines, there existed four tiers of surveys. The north tier of surveys extended southward to the southern boundary line of Surveys 901 and 902, which were laid down on the ground by Samuel M. Jarvis on October 25, 1876. To the south, and not adjoining the north tier of surveys, was another tier of surveys consisting of surveys 733, 734, 789, 790, 791, 792, 793, 794, 795 and 796, which were actually surveyed on the ground by Samuel M. Jarvis during the period of time from January 22, 1876, to March 16, 1876. To the west, and adjoining both the south and north tiers of surveys, there existed a tier of surveys consisting of Surveys 116, 115, 72, 73, 114, 111 and 110, all of which were actually surveyed on the ground in September, 1879, by A. M. French. To the east, and adjoining Surveys 795 and 793, there existed another tier of surveys consisting of Surveys 36, 35, 34, 33, 37 and 40 (all surveyed by J. J. Dix in September, 1878), which, to the north, adjoined the Duval County School Land surveyed by French in 1880 which, in turn, adjoined the east line of Survey 901. * * *

"On May 10, 1886, J. J. Dix located 'fill-in' Surveys Nos. 321 and 322, taking up the east portion of the unappropriated public domain lying between the aforemen-

tioned north, south, west and east tiers of surveys. . * * *

"On May 13, 1886, when J. J. Dix located Survey 383, there existed the following situation: senior surveys had been placed on the ground to the north, south, west and east. The State of Texas was obligated, under Confederate Land Scrip issued to Mary H. Chatham, to locate a section of land for her. Accordingly, John J. Dix, as District Surveyor of the Duval Land District, was instructed by the State of Texas to locate vacant public domain and to survey same for Mary H. Chatham. Having formerly located on the ground the most easterly tier of surveys, and knowing that vacant public domain remained, Dix located Survey 383 on May 13, 1886, a portion of which is the land now in controversy, filling in and taking up all of the vacant lands lying in between and being bounded by these older tiers of senior surveys, except on the extreme south. * * *

"On November 8, 1907, Survey 383, under the Dix field notes of 1886, was awarded. by the State of Texas to one Juan Guzman, * * *. On January 29, 1910, Juan Guzman conveyed Survey 383 to J. B. Peal. * * *"

At the time of the transaction whereby Luling Company acquired a royalty interest in Survey 383 from Peal no patent on said Survey had been issued by the State of Texas. The attorney for Luling, upon examination of the abstracts, required that Peal file his deed from Guzman in the General Land Office and that any remainder of the purchase price due to the State of Texas be paid and patent issued to J. B. Peal, in accordance with field notes to be disclosed by a survey on the ground.

The attorney for Luling also pointed out that there was a possible conflict between Surveys 383 and 115, and this was given as an additional reason for the requirement that "a competent State licensed surveyor survey the land on the ground."

The attorneys for Peal wrote the Commissioner of the General Land Office with reference to securing a patent and were informed by the Commissioner that an excess was indicated and field notes were required to be furnished by the County Surveyor of Duval County, or some licensed land surveyor, and further that the amount due the State would vary according to the excess acreage shown by field notes.

It was originally agreed between the parties that the consideration moving from the Luling Company to Peal should be paid upon a per acre basis, the exact amount thereof to be determined by a survey upon the ground. However, prior to the making of the resurvey (and subsequent to the notification of a probable excess), Peal agreed to accept payment of the consideration upon the acreage basis set out in the royalty deed.

After the consideration had been paid, E. J. Foster, a State licensed surveyor, made a resurvey of Survey 383, which disclosed the fact that the Dix Survey and field notes of May 13, 1886, were incorrect in several particulars. The most serious error in the Dix field notes was the distance given for the east boundary line of Survey 383; that is, the distance from the south boundary line of Survey 901 to the north boundary line of Survey 796. The distances given for the west boundary line of Survey 383 were correspondingly incorrect. The distance from the south boundary line of Survey 901 to the north boundary line of 796, as given by Dix, was 1,274 varas. By a survey upon the ground, Foster found this distance to be 1,627 varas, a discrepancy of 353 varas.

The map referred to in the original opinion as the Luling map, was not prepared by the Luling Company but was evidently purchased from a civil engineer and map maker of Laredo, Texas. This map shows more than 80 surveys of an approximate average of 640 acres each, upon a scale of one inch to 1,600 feet. It is conceded by the parties that this map is incorrect and does not correctly show the position of Survey 796 as the same is located on the ground. This inaccuracy was apparently caused by a use of the Dix field notes, which were incorrect in the distances given on the east and west boundary lines of Survey No. 383, as above pointed out. The broken line upon the map contained in the original opinion indicates the south boundary line of Survey 796, as shown on the so-called "Luling" map. However, it clearly appears from the evidence that there was no doubt as to the exact location of this south boundary line upon the ground.

This Survey (796), as above pointed out, was located and surveyed by Jarvis in June 1876. The beginning point of the Jarvis Survey was a stake at the southwest corner

of Survey 795 and the southeast corner of Survey 796.

Foster made a resurvey of 796 in June, 1936, and began at the southeast corner of said Survey 796, and from these field notes it appears that the original Jarvis beginning point had been reestablished by J. J. Dix in the year 1892. Foster found the Jarvis field notes substantially correct. The southeast corner of the survey and the south boundary line thereof appear to be well established and their actual location is beyond dispute. The record shows that Peal's fence runs along the east boundary line of Survey 794 to the south boundary line of 796, thence in an easterly direction along the south boundary line of 796 to the southeast corner thereof, and thence in a northerly direction along the east boundary line of Survey 796. It therefore appears that the southeast corner of 796 was also an outside corner of Peal's fence line.

The testimony shows that the Luling Company intended to buy a tract of land in Survey 383, which would be bounded on the south by an extension of the south line of Survey 796 crossing Survey 383. The lines marked off on the Luling map indicate that this is true. Even though that map was incorrect in its portrayal of the distance between the south line of Survey 901 and the north line of Survey 796, the lines drawn thereon indicate that the parties intended to describe a tract of land bounded on the south by an extension of the south line of 796.

It further appears that one Mortimer drilled a well for oil, which well was located 330 feet north of the south boundary line of Survey 796 and 330 feet west of the east boundary of the west half of said Survey 796. It also appears that the Luling Company drilled a well in the northwest quarter of the southeast quarter of Survey 72. There is no doubt as to the location of the Mortimer well with reference to the true south boundary line of Survey 796.

Guy Ratliff, the chief geologist of the Luling Company, who conducted negotiations for the purchase of the royalty interest from Peal, testified that he indicated to Peal the tract of land on the Luling map which he desired to purchase, and in so doing he projected the north line of Survey 794 (which was the south line of Survey 796) in a westerly direction across Survey 383.

Mr. Ratliff, by his testimony, explained fully why he desired to purchase royalty under the tract of land having the south boundary indicated by him. His testimony shows that he intended to buy a tract of land which would be bounded upon the south by the continuation of a line lying 330 feet south of the Mortimer well and that he did not intend to buy a tract of land which would be bounded on the south by an east and west line which when extended would lie north of the Mortimer well.

Mr. Thomas W. Smith, vice-president and treasurer of the Luling Company, testified that the location of the tract of land in controversy with reference to the Mortimer well, as well as the Luling well, was an important consideration in his company's decision to purchase the same.

The testimony of appellant, J. B. Peal, also indicates that the south boundary line of the tract which he discussed selling to Luling Company was the one deemed of importance to the parties. When asked to identify the tract of land upon the Luling map, he did so by extending the south line of Survey 796 across Survey 383 to a point where he supposed it would intersect the west line of Survey 72.

We therefore conclude that a jury finding to the effect that the Luling Company intended to purchase royalty under a tract of land in Survey 383, the south boundary line of which would lie a substantial distance north of the extended south boundary line of Survey 796 could not be supported by the evidence.

The motion for rehearing is overruled.

In view of the foregoing, appellant may file a second motion for rehearing, should he so desire.